THE UPJOHN COMPANY v NEW HAMPSHIRE INSURANCE
COMPANY

Docket Nos. 98969, 99012, 99145. Submitted January 4, 1989, at
Detroit. Decided May 26, 1989. Leave to appeal applied for.

On August 13, 1982, The Upjohn Company began its annual
production of Clindamycin, an antibiotic, in Puerto Rico. As a
result, two by-products, carbon tetrachloride and acetonitrile,
were produced. Upjohn had a 10,000-gallon capacity under-
ground storage tank into which the toxic by-products were
pumped. Each weekday, an Upjohn employee measured the
level of the chemicals in the tank by using a stick. The
employee recorded the level of the material on a sheet and
turned the sheet over to his supervisor, who would review the
sheet to determine if the tank was full and needed to be
emptied. Up until August 16, 1982, the tank level remained
constant at ten inches, which would indicate approximately 475
gallons of material in the tank. On August 16, 1982, Upjohn
pumped approximately 1,700 gallons of the toxic material into
the tank. A check of the level in the tank showed three inches
of material, or approximately eighty gallons. Material was
pumped into the tank on nine separate occasions between
August 13 and September 1, 1982. The tank levels fluctuated
but never showed more than 1,794 gallons at any one time in
the tank. On September 3, 1982, during a monthly audit of the
tank inventory records, the suspicious tank level readings were
noticed and no further material was pumped into the tank. The
tank was then emptied and it was discovered that there were
holes in the tank due to corrosion. Upjohn estimated that
approximately 15,000 gallons of the toxic material leaked from
the tank, moving into the soil beneath Upjohn's property as
well as into the ground water below. When a well on neighbor-
ing property proved to be contaminated with carbon tetrachlo-
ride, Upjohn supplied water to the surrounding communities.
Upjohn then developed a new technology to remove carbon

REFERENCES

Am Jur 2d, Insurance §§ 1270 et seq.; Pollution Control §§ 482, 486.
Construction and application of pollution exclusion clause in liabil-
ity insurance policy. 39 ALR4th 1047.

tetrachloride from its subsoil before it reached the ground water. Upjohn used another process to decontaminate the tainted ground water. John Russell Butler, an insurance underwriter, and First State Insurance Company were Upjohn's property insurers at that time and reimbursed Upjohn for some of its losses incurred due to the cleanup efforts. Upjohn, Butler, and First State filed suit against New Hampshire Insurance Company, Granite State Insurance Company, the Insurance Company of the State of Pennsylvania, First State Insurance Company, and Allstate Insurance Company in Oakland Circuit Court claiming that the defendants are liability or excess liability insurers of Upjohn and claiming coverage under the defendants' policies. Plaintiffs and defendants both moved for summary disposition. The court, Steven N. Andrews, J., held that the contamination was an occurrence under defendants' policies and that coverage was not precluded by the pollution exclusions contained in those policies. Allstate's claim that property insurance was "other insurance" under its policy was rejected. The court also held that Upjohn's cleanup costs were recoverable as damages under defendants' policies, but noted that defendants were not liable for damages to Upjohn's own property. Finally, the court held that the Insurance Company of the State of Pennsylvania and First State Insurance Company were not liable because the occurrence of the contamination took place before September 30, 1982, the effective date of those defendants' policies. Three separate appeals were filed from the court's ruling. The appeals have been consolidated.

The Court of Appeals *held:*

1. The trial court did not err when it held that there was no genuine issue of material fact that the leakage was an occurrence under the policies issued by Granite and Allstate. Under those policies, coverage is excluded for intentional acts of the insured. It cannot be said that Upjohn knew of the leak and continued to add by-product mixture to the tank. The leakage and subsequent contamination were not intentional acts by Upjohn.

2. The pollution exclusions in Granite's and Allstate's policies do not prevent recovery by plaintiffs. Those exclusions do not apply to sudden and accidental escapes of material. A continuous discharge of chemicals may be both accidental, i.e., unintended, and sudden, i.e., unexpected, even though it occurred over a three-week period. The court did not err in concluding that there was no genuine issue of material fact that the leak was sudden.

3. Upjohn was entitled to damages under Granite's and

Allstate's policies for its cleanup efforts on its own property and for the costs of complying with future government cleanup orders. Contamination of the ground water was compensable under both policies because the ground water belonged to the people of Puerto Rico, not Upjohn. Furthermore, had governmental agencies ordered Upjohn to clean up the contamination, Upjohn would have been legally obligated to pay the costs of cleanup, for which it would be entitled to reimbursement by Granite and Allstate. It makes no difference that Upjohn took the remedial action before being ordered to do so.

4. The trial court did not err when it held that property insurance was not "other insurance" under the terms of Allstate's policy. Different risks, interests, and subject matter were covered.

5. Damage occurred with each spill up to and including September 30, 1982, the expiration date of Allstate's policy.

6. The trial court did not err when it granted summary disposition to the Insurance Company of the State of Pennsylvania and First State Insurance Company. The court correctly ruled that an occurrence-based policy does not provide protection for claims arising out of acts or omissions which occurred prior to the effective date of the policy. Both policies took effect on September 30, 1982, more than three weeks after Upjohn had discovered the leak.

7. The trial court's order on liability should be amended to reflect the fact that Granite should be liable only to the extent New Hampshire Insurance Company does not provide coverage.

Affirmed as modified.

1. INSURANCE — INTENTIONAL INJURIES — INTENTIONAL ACTS.
   Where insurance coverage is precluded for injury which is expected or intended by the insured, all the insurer must show is that the injury was the natural, foreseeable, expected, and anticipatory result of an intentional act.

2. INSURANCE — TOXIC MATERIAL — POLLUTION EXCLUSION CLAUSES — SUDDEN AND ACCIDENTAL LEAKAGE.
   The escape of toxic manufacturing by-product material from an underground tank may be considered to have been sudden and accidental for the purposes of an insurance policy pollution exclusion clause even though the leakage occurred over a three-week span; the word "sudden" as used in the pollution exclusion clause may be equated with the word "unexpected," while "accidental" may be equated with "unintended."

3. Insurance — Toxic Material — Pollution Exclusion Clauses — Coverage for Cleanup of Insured's Property.

The improper release of toxic wastes may cause property damage not only to the actual owner of the land but also to the government because of its independent interest, behind the titles of its citizens, in all the air and earth within its domain; thus, governmental agencies have the legal authority to order a manufacturer which causes the release of toxic wastes to take remedial action to rectify the damage and the manufacturer would be legally obligated to pay the costs of the cleanup; on this basis, an insurer insuring the manufacturer against sudden and accidental leakage of toxic material may be required to recompense the manufacturer for the costs associated with the cleanup of toxic waste from its own property as well as the costs associated with the cleanup of property belonging to others.

4. Insurance — Occurrence Policies.

An occurrence-based insurance policy does not provide protection for claims arising out of acts or omissions which occurred prior to the effective date of the policy.

*Denenberg, Tuffley, Bocan, Jamieson, Black, Hopkins & Ewald, P.C.* (by *Julius Denenberg, William G. Jamieson, George F. Curran, III,* and *Dana L. Ramsay*), for plaintiff.

*Zamplas, Paskin, Nagi, Baxter, Johnson & Walker, P.C.* (by *Dennis Zamplas, Jeannette A. Paskin,* and *William J. Selinsky*), for New Hampshire Insurance Company, Granite State Insurance Company, and the Insurance Company of the State of Pennsylvania.

*Garan, Lucow, Miller, Seward, Cooper & Becker, P.C.* (by *Thomas W. Emery* and *Robert D. Goldstein*), and *Phillip J. McGuire,* of Counsel, for Allstate Insurance Company.

*Buesser, Buesser, Blank, Lynch, Fryhoff & Graham* (by *William R. Buesser* and *Neil K. Disney*), for First State Insurance Company.

Amicus Curiae:

*Butzel, Long, Gust, Klein & Van Zile* (by *Keefe A. Brooks),* and *Piper & Marbury* (by *Thomas W. Brunner, Jeffrey F. Liss,* and *John W. Cavilia*), of Counsel, for Insurance Environmental Litigation Association.

Before: GILLIS, P.J., and SHEPHERD and SAWYER, JJ.

PER CURIAM. In case number 98969, defendant-appellant Allstate Insurance Company, successor to Northbrook Excess and Surplus Insurance Company (NESCO), appeals as of right from the circuit court's order granting plaintiffs' motion for summary disposition pursuant to MCR 2.116(C)(10). In case number 99012, defendant-appellant Granite State Insurance Company appeals as of right from the circuit court's order granting plaintiffs' motion for summary disposition pursuant to MCR 2.116(C)(10). In case number 99145, plaintiffs-appellants appeal as of right from the circuit court's order granting defendants-appellees' motion for summary disposition pursuant to MCR 2.116(C)(10). We affirm in case numbers 98969 and 99145, but modify, in part, in case number 99012.

On August 13, 1982, plaintiff The Upjohn Company began its annual production of Clindamycin, an antibiotic, in Puerto Rico. As a result, two by-products, carbon tetrachloride and acetonitrile, were produced. The by-product mixture was sixty-five percent carbon tetrachloride and thirty-five percent acetonitrile. These toxic by-products were pumped into an underground tank FA-129 for storage. Tank FA-129 had been in use since May 29, 1974, and had not been used since the previous year's Clindamycin production. Tank FA-129 had a

ten-thousand-gallon capacity. Each weekday, an Upjohn employee measured the tank's level by using a stick. The employee recorded the level of material in the tank on a sheet and turned the sheet over to his supervisor. The supervisor reviewed the sheet to determine if the tank was full and should be emptied. Prior to August 16, 1982, the tank level remained constant at ten inches, approximately 475 gallons.

On August 16, 1982, Upjohn pumped approximately 1,700 gallons of by-product material into tank FA-129. That day, the tank level was three inches, approximately eighty gallons. On August 18, 19, 24, 25, 26, 30 and 31 as well as on September 1, 1982, approximately 1,700 gallons of by-products were added daily to tank FA-129. The following chart shows the tank levels:

|  |  | Level in inches | Approximate gallons |
|---|---|---|---|
| August | 16 | 3 | 80 |
|  | 17 | 11.5 | 585 |
|  | 18 | 11.5 | 585 |
|  | 19 | 10.5 | 511 |
|  | 20 | 16 | 945 |
|  | 23 | 8 | 342 |
|  | 24 | 8 | 342 |
|  | 25 | 10.5 | 511 |
|  | 26 | 8 | 342 |
|  | 27 | 8 | 342 |
|  | 30 | 8.5 | 375 |
|  | 31 | 15.5 | 903 |
| September | 1 | 25 | 1794 |
|  | 2 | 18.5 | 1167 |
|  | 3 | 10.5 | 511 |

The daily readings and the amount of by-product material produced were reconciled once a month pursuant to Upjohn policy. On September 3, 1982, the suspicious readings were "noticed" and no further by-products were emptied into that tank.

Later, the tank was emptied and a subsequent

visual inspection revealed holes in the tank. The inside of the tank was corroded.

Upjohn believed that approximately 15,000 gallons of by-products had leaked from tank FA-129. The by-products moved into the soil beneath Upjohn's property as well as into the ground water below.

Upjohn monitored a nearby well belonging to the A. H. Robins Company. That well was not contaminated when it was built in 1981, but was found to be contaminated with carbon tetrachloride within weeks of the incident. Once the contamination was confirmed, Upjohn supplied water to the A. H. Robins Company as well as to the surrounding communities.

Subsequently, Upjohn developed a new technology which it used to remove carbon tetrachloride from its subsoil before it reached the ground water. This technology proved to be highly successful. Upjohn also used another process to decontaminate the tainted ground water.

Plaintiffs John Russell Butler and First State Insurance Company, issuing property policy GC-809000, are Upjohn's property insurers and have reimbursed Upjohn for some of its losses. Upjohn and its property insurers, as Upjohn subrogees, sued defendants, which are Upjohn's liability or excess liability insurers, claiming coverage under those policies.

Plaintiffs moved for summary disposition pursuant to MCR 2.116(C)(9) and (10). Almost all defendants then moved for summary disposition pursuant to MCR 2.116(C)(8) and (10). The circuit court held that the contamination was an occurrence under defendants' policies and that coverage was not precluded by the pollution exclusions contained therein. Moreover, the circuit court rejected Allstate's claim that property insurance was

"other insurance" under Allstate's policy. The circuit court also held that Upjohn's cleanup costs were recoverable as damages under defendants' policies; however, the circuit court noted that defendants were not liable for damages to Upjohn's own property. Finally, the circuit court held that defendants, The Insurance Company of the State of Pennsylvania and First State Insurance Company, issuing excess liability policy number 916075, were not liable because the occurrence took place before September 30, 1982, the effective date of those policies.

A motion for summary disposition under MCR 2.116(C)(10) tests the factual support for a claim. *Boyle v Odette,* 168 Mich App 737, 742; 425 NW2d 472 (1988). Summary disposition is appropriate under this subrule only if the court is satisfied that it is impossible for the nonmoving party's claim to be supported at trial because of a deficiency which cannot be overcome. The trial court must give the benefit of any reasonable doubt to the nonmoving party. *Id.* at 742-743. This Court is liberal in finding a genuine issue of material fact. *Id.* at 743. Nevertheless, where the opposing party fails to come forward with evidence, beyond its allegations or denials in the pleadings, to establish the existence of a material factual dispute, the motion is properly granted. *Id.;* MCR 2.116(G)(4).

Both Granite and Allstate claim that the circuit court erred when it held that there was no genuine issue of material fact that the leakage was an occurrence under their policies. Granite and Allstate contend that Upjohn's actions were intentional because the daily readings of tank FA-129 should have alerted Upjohn to a leakage problem on August 16, 1982, and, in spite of the warning, Upjohn intentionally continued to pump by-products into a defective tank. Moreover, Granite and

Allstate argue that Upjohn intended to pollute because it pumped over 15,000 gallons of by-product material into a 10,000 tank.

Granite's policy provides:

"[O]ccurrence" means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured[.]

Nesco's policy provides:

The term "occurrence" wherever used herein shall mean an accident or a happening or event or a continuous or repeated exposure to conditions which unintentionally results in personal injury, property damage or advertising liability during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence.

In *Guerdon Industries, Inc v Fidelity & Casualty Co of New York,* 371 Mich 12, 18-19; 123 NW2d 143 (1963)(quoting 10 Couch on Insurance [2d ed], § 41:6, p 27), our Supreme Court noted:

An "accident", within the meaning of policies of accident insurance, may be anything that begins to be, that happens, or that is a result which is not anticipated and is unforeseen and unexpected by the person injured or affected thereby—that is, takes place without the insured's foresight or expectation and without design or intentional causation on his part. In other words, an accident is an undesigned contingency, a casualty, a happening by chance, something out of the usual course of things, unusual, fortuitous, not anticipated, and not naturally to be expected.

Where coverage is precluded for intentional injury, as it is in NESCO's policy, the insured must intend to cause the injury. See, e.g., *Putman v Zeluff,* 372 Mich 553; 127 NW2d 374 (1964); *Morrill v Gallagher,* 370 Mich 578, 588; 122 NW2d 687 (1963). Where coverage is precluded for injury which is expected or intended by the insured, as it is in Granite's policy, it must only be shown that the injury was the natural, foreseeable, expected, and anticipatory result of an intentional act. *State Farm Fire & Casualty Co v Jenkins,* 147 Mich App 462, 466-468; 382 NW2d 796 (1985).

Certainly, Upjohn did not expect or intend that corrosion and a subsequent leak occur on August 16, 1982, the date the first 1,700 gallons of by-product mixture was added to tank FA-129. And while we agree that Upjohn may have been negligent in failing to detect the problem sooner, we cannot say that Upjohn knew of the leak and continued to add by-product mixture to tank FA-129 given the procedures it followed.

Granite and Allstate also claim that the pollution exclusions in their policies prevented recovery.

NESCO's policy provided:

> This policy shall not apply: . . .
>
> *    *    *
>
> (f) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalies, toxic chemicals, liquids or gaseous waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

Granite's policy provides:

This insurance does not apply:

\* \* \*

(f) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis [sic], toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

Both Allstate and Granite claim that the escape of the by-product material was not sudden and accidental because it occurred over a three-week span. This Court has previously equated the word "sudden" as used in the pollution exclusion clause with the word "unexpected." *Jonesville Products, Inc v Transamerica Ins Group,* 156 Mich App 508, 512; 402 NW2d 46 (1986), lv den 428 Mich 897 (1987). Like the panel in *Jonesville Products, Inc,* we believe that even a continuous discharge of chemicals may be both accidental (i.e., unintended) and sudden (i.e., unexpected) and, therefore, outside the pollution exclusion. *Id.* As noted above, the trial court did not err when it found that there was no genuine issue of material fact that the leak was accidental. Likewise, the trial court properly concluded that there was no genuine issue of material fact that the leak was sudden (i.e., unexpected) even though it occurred over a three-week period.

Allstate and Granite further claim that the costs of Upjohn's cleanup efforts on its own property were not recoverable as damages under their policies and that the trial court erred when it found that the costs of complying with future government cleanup orders were damages.

Nesco's policy provides:

I. COVERAGE

The Company hereby agrees, subject to the limitations, terms and conditions hereinafter mentioned, to:

(a) indemnify the Insured for all sums which the Insured shall be obligated to pay by reason of liability imposed upon the Insured by law, or liability assumed by the Insured under contract or agreement; for all damages, direct or consequential, and expenses, all as more fully defined by the term "ultimate net loss", on account of

\* \* \*

(ii) Property Damage . . . .

\* \* \*

The term "Property Damage" wherever used herein shall mean loss of or damage to or destruction of tangible property (other than property owned by the Named Insured).

\* \* \*

The term "Ultimate Net Loss" shall mean the total sum which the Insured, or any company as his insurer, or both, become obliged to pay by reason of personal injury, property damage or advertising liability claims, either through adjudication or compromise, and shall also include hospital, medical and funeral charges and all sums paid as salaries, wages, compensation, fees, charges and law costs, premiums on attachment or appeal bonds, interest, expenses for doctors, lawyers, nurses and investigators and other persons, and for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder, excluding only the salaries of the Insured's or of any underlying insurer's permanent employees.

Granite's policy provides:

"[P]roperty damage" means (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use

thereof at any time resulting therefrom, or (2) loss of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period. . . .

\* \* \*

The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of

\* \* \*

D. property damage to which this insurance applies, caused by an occurrence . . . .

Exclusions

This insurance does not apply:

\* \* \*

(d) to property damage to

(1) property owned . . . by the insured.

As noted above, the nearby A. H. Robins Company well was contaminated. This indicated that some ground water contamination had occurred; however, most of the contamination was in Upjohn's subsoil and would eventually make its way into the ground water.

At that point, Upjohn was presented with three alternatives. The first was excavation. Upjohn could have excavated soil at least twenty-five feet below the spill, which occurred twelve feet underground, and shipped the material to Louisiana for disposal. This alternative would have required excavation of at least 50,000 cubic yards of material. It would have ruined the tank farm and contamination of the underground water still would have occurred to some extent. This alternative would have cost approximately $8.5 million.

As a second alternative, Upjohn could have excavated and kept the soil in Puerto Rico until it developed a hazardous waste dump site. This alter-

native would have had the same disadvantages as the first alternative, but would have cost approximately $5 million.

Upjohn could also have engaged in a process called "flushing", whereby it would have dug a shallow hole over the contaminated spot, filled it with water, allowed the water to flow through to the ground water, collected the ground water, cleaned the ground water, and then returned the ground water. The problem with flushing was that there was no way to have known where the contaminated water would go given Puerto Rico's geology.

Instead of using any of these alternatives, Upjohn developed a vacuum technology which removed the contaminant before it reached the ground water. This technique was cost effective and Upjohn's expert testified that it would cost 1,000 times more per pound to remove the contaminant once it reached the water. Upjohn's expert testified that approximately eighty-five percent of the contaminant was removed from the space above the ground water and fifteen percent of the contaminant was removed from the ground water. Upjohn's experts testified that the contamination was moving quickly and within seven years extensive ground water contamination would occur if no action was taken.

Certainly, the damage to the A. H. Robins Company well was compensable under both NESCO's and Granite's policies. Moreover, we believe that contamination of the ground water was compensable under both policies because the ground water belonged to the people of Puerto Rico rather than to Upjohn. 1976 PR Laws 136. See, e.g., *United States Aviex Co v Travelers Ins Co,* 125 Mich App 579; 336 NW2d 838 (1983). Furthermore, contrary to Allstate's and Granite's arguments, we agree

with the trial court that governmental agencies could have ordered Upjohn to act and, had they done so, Upjohn would have been legally obligated to pay the costs of cleanup (i.e., costs to prevent damage to third parties). See *Fireman's Fund Ins Companies v Ex-Cell-O Corp*, 685 F Supp 621, 625 (ED Mich, 1987); *United States Fidelity & Guaranty Co v Thomas Solvent Co*, 683 F Supp 1139, 1168-1170 (WD Mich, 1988); *United States Aviex Co, supra*. See also *Aronson Associates, Inc v Pennsylvania Nat'l Mutual Casualty Ins Co*, 14 Pa D & C 3d 1 (1977), aff'd 272 Pa Super 606; 422 A2d 689 (1979). We note that the improper release of toxic wastes may cause property damage not only to the actual owner of the land, but also to the government because of its independent interest, behind the titles of its citizens, in all the air and earth (i.e., its natural resources) within its domain. See, e.g., *Continental Ins Companies v Northeastern Pharmaceutical & Chemical Co, Inc*, 811 F2d 1180 (CA 8, 1987), rev'd in part on rehearing en banc 842 F2d 977, 983-984 (CA 8, 1988), cert den — US —; 109 S Ct 66; 102 L Ed 2d 43 (1988); *Fireman's Fund Ins Companies, supra*. We believe that it makes no difference that Upjohn took the remedial action it did before being ordered to do so and, in fact, we believe that such swift remedial action should be encouraged rather than discouraged. *United States Aviex Co, supra*.

Allstate also claims that the trial court erred when it held that property insurance was not "other insurance" under the terms of NESCO's policy which provided:

> If other valid and collectible insurance with any other insurer is available to the Insured covering a loss also covered by this policy, other than insurance that is in excess of the insurance afforded by

> this policy, the insurance afforded by this policy
> shall be in excess of and shall not contribute with
> such other insurance. Nothing herein shall be
> construed to make this policy subject to the terms,
> conditions and limitations of other insurance.

The trial court held that property insurance was not other insurance under NESCO's liability insurance because it did not cover the same risks, interests, and subject matter, citing *Consolidated Rail Corp v Certain Underwriters at Lloyds & British Co,* Docket No. 84-2609 (ED Pa, June 5, 1986), aff'd 853 F2d 917 (1988). We agree. Although it may be difficult to separate damages incurred in mitigating damages to third parties from damages incurred by Upjohn's property, this distinction must be made.

Allstate further contends that no occurrence took place during the time NESCO's policy was in effect. NESCO's policy expired September 30, 1982. Allstate claims that an occurrence occurs when the complaining party is actually damaged and not when the wrongful act is committed, citing *Frankenmuth Mutual Ins Co, Inc v Eurich,* 152 Mich App 683; 394 NW2d 70 (1986), lv den 426 Mich 881 (1986). Given our earlier discussion of damages, we believe that damage occurred with each spill within the policy period.

As noted above, plaintiffs-appellants in case number 99145 contend that the trial court erred when it granted summary disposition to defendants The Insurance Company of the State of Pennsylvania and First State Insurance Company, issuing excess liability policy No. 916075. The trial court ruled that an occurrence-based policy does not provide protection for claims arising out of acts or omissions which occurred prior to the effective date of the policy, citing *Detroit Automo-*

*bile Inter-Ins Exchange v Leonard Underwriters, Inc,* 117 Mich App 300, 303; 323 NW2d 679 (1982). Both policies took effect on September 30, 1982, over three weeks after Upjohn had discovered the leak. Despite plaintiffs-appellants' arguments to the contrary, we agree with the trial court.

Finally, Granite claims the circuit court erred when it did not specifically find that it was an excess insurer to New Hampshire Insurance Company. While the issue was apparently to be resolved by the parties below, it was not; however, plaintiffs now concede that Granite should be liable only to the extent New Hampshire does not provide coverage. We agree and the trial court's order on liability should be amended to reflect this fact.

Affirmed as modified.