NORTHERN ILLINOIS GAS COMPANY, Plaintiff-Appellant, v. HOME INSURANCE COMPANY *et al.*, Defendants-Appellees.

First District (2nd Division)    No. 1—00—0832

Opinion filed September 3, 2002.

John D. Shugrue and Daniel J. Struck, both of Zevnik Horton, Kevin M. Forde and Mary Anne Mason, both of Kevin M. Forde, Ltd., and James A. White, of Jones, Day, Reavis & Pogue, all of Chicago, Stephen J. Goodman, of Jones, Day, Reavis & Pogue, of Washington, D.C., and Lester O. Brown, of Jones, Day, Reavis & Pogue, of Los Angeles, California, for appellant.

Theodore J. May, Michael Warnick, and Scott M. Salerno, all of Fedota, Childers & Rocca, P.C., of Chicago, for appellee Home Insurance Company.

Clausen Miller P.C., of Chicago (Susan Condon, James T. Ferrini, Margaret J. Orbon, and Gordon K. Walton, of counsel), for appellee Lexington Insurance Company.

William M. Cohn and Brian E. Mahoney, both of Cohn & Baughman, of Chicago, for appellee Century Indemnity Company.

Daniel E. Troy, John C. Yang, and John P. Malloy, all of Wiley, Rein & Felding, of Washington, D.C., for amicus curiae Insurance Environmental Litigation Association.

JUSTICE McBRIDE delivered the opinion of the court:

This dispute arises out of a declaratory judgment action filed by plaintiff-appellant, Northern Illinois Gas Company, now known as Ni-

cor Gas (Nicor), against defendants-appellees: The Home Insurance Company (Home); Certain Underwriters at Lloyd's and Certain London Market Insurance Companies (London); Lexington Insurance Company (Lexington); Century Indemnity Company (Century); Northwestern National Insurance Company (Northwestern); Stonewall Insurance Company (Stonewall); and Yasuda Fire and Marine Insurance Company of Europe Limited (Yasuda)[1] (collectively referred to as the Insurers). Nicor filed the declaratory action seeking indemnification from the Insurers to recover the costs of investigating and remediating environmental contamination at six manufactured gas plant (MGP) sites located in Illinois. The Insurers filed various motions for summary judgment. The trial court granted some of those motions on February 10, 2000. Nicor now appeals those rulings.

Two issues are raised on review. First, whether the trial court erred in granting the Insurers' motions for summary judgment on the ground that Nicor should not be indemnified for expenses it voluntarily incurred for investigation and remediation of five MGP sites. Second, whether the trial court erred in granting the Insurers' motions for summary judgment on the ground that the environmental contamination at the various sites did not constitute "occurrences" under the policies at issue. We state the following background facts.

Nicor seeks indemnification for the costs of investigating and remediating property damage at several MGPs located in Aurora, Belvidere, Bloomington, Lockport,[2] Ottawa, and Streator, Illinois. The record reveals that some of these MGPs were in operation as early as the mid 1800s. One of the by-products of the gas manufacturing process was tar, which was either sold or stored in various underground containment structures located on site at the the MGPs. In the 1900s, the introduction of natural gas made manufactured gas production obsolete. Thus, by the early 1950s, all six of the facilities in question were no longer operational.

At the time the MGPs were retired, the owners made efforts to extract some of the tar from the underground containers, but some of the tar remained in these structures. The underground tanks were then emptied of usable material and filled with building debris or alternative materials to bring them to ground level.

The record reveals that in the years after the MGPs were sealed,

---

[1]After the oral arguments, London, Stonewall, and Yasuda were dismissed as parties to this appeal. Northwestern was previously dismissed.

[2]Nicor notes in its brief that the Insurers did not move for summary judgment concerning the Lockport site because a private party sued Nicor for costs arising from environmental contamination at that site.

coal tar and coal tar water mixtures were released from the structures into the surrounding soil and groundwater. The release of these substances contaminated the groundwater, soil, and the surrounding environment.

James Janssen, an official with the Illinois Environmental Protection Agency (IEPA), testified that the IEPA became aware of environmental pollution at MGP sites in 1983. From 1983 to the present, the IEPA has been involved with the immediate removal and voluntary cleanup program at MGP sites in Illinois. Although the name of the voluntary cleanup program changed to the "pre-notice program," and then to the "site remediation program" over the years, Janssen said that these programs were one and the same. In 1987, Janssen said that a meeting was held at which Illinois utility companies were informed by the IEPA that "they may want to investigate" potential environmental problems at MGPs under their control. He further testified that the purpose of the voluntary cleanup program was to allow the State to offer its review, comment, and ultimately concurrence on the cleanup activities undertaken at sites where contamination was present. According to Janssen, no consent decree or court filing was required for a utility to become involved with the voluntary cleanup program. He further stated that no representation was ever made to a landowner that it was "legally obligated" to enroll a site in the voluntary cleanup program and that the program was "non-adversarial." In essence, Janssen explained that the property owners were coming to the IEPA and seeking the IEPA's input into the process of handling contamination.

Robert O'Hara, an IEPA project manager for the site remediation program, testified that the site remediation program is voluntary in nature as opposed to action taken by the IEPA under section 4(q) of the Environmental Protection Act (415 ILCS 5/4(q) (West 1998)). Action taken by the IEPA under section 4(q) involves the IEPA providing notice to a utility that it intends to take certain adversarial action in the event the utility fails to adequately respond to a cleanup request. 415 ILCS 5/4(q) (West 1998).

In 1992, the record demonstrates that Nicor began to enroll its sites into the IEPA's voluntary cleanup program. O'Hara testified that, to his knowledge, Nicor had enrolled all six sites at issue into the voluntary cleanup program.

With respect to the Ottawa site, the record reveals that Nicor drafted a review and evaluation services agreement concerning reimbursement of the IEPA's oversight costs incurred in overseeing the cleanup at the Ottawa location. Nicor asked the IEPA to sign this agreement. However, in a letter dated May 12 1997, the IEPA wrote back in response stating:

"Please be advised that the Division of Legal Counsel has determined that the draft Review and Evaluation Services Agreement is substantially in conflict with Title XVII of the Environmental Protection Act and contains misstatements of law and fact. Specifically, *** [t]he eighth paragraph beginning 'WHEREAS' states that the Illinois EPA has requested that Northern Illinois Gas and Commonwealth Edison Company perform necessary and appropriate actions at the site. The Illinois EPA has not provided notice to either Northern Illinois Gas or to Commonwealth Edison Company for the conduct of any response actions necessary to eliminate or mitigate significant risks to human health and the environment presented by the release of any hazardous substances at the site."

The record reveals that Nicor then undertook some measures to begin remediation at the sites in question. Nicor argues that in doing so, it has incurred millions of dollars in expenses for investigation and cleanup at the various sites. As a result, Nicor seeks reimbursement from the Insurers for the costs incurred for the remediation and cleanup of the sites at issue.

Nicor claims that for an extended period of time, including but not limited to the period 1955 to 1985, it purchased a series of comprehensive general liability policies from a variety of insurance companies. In addition to the general liability policies, certain excess and umbrella policies were purchased. These policies were issued by the Insurers, specifically Home, Lexington, and Century. There are slight variations in the language of the Insurers' policies, but they are all policies that provide coverage in the event of an "occurrence." For instance, the applicable coverage language in the Home policies states:

"The Company hereby agrees to indemnify the Insured for all sums which the insured shall be obligated to pay by reason of the liability imposed upon the insured by law, or assumed by the Insured under contract or agreement, for damages, direct or consequential, and expenses, all as more fully defined by the term 'ultimate net loss,' on account of personal injuries and property damage caused by or growing out of each occurrence."

Similar language in one of the Lexington policies provides:

"Underwriters hereby agree to indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of the liability imposed upon by law *** for damages *** on account of *** property damage caused by or growing out of each occurrence."

The policies define the term "occurrence" as follows: "The term 'occurrence,' wherever used herein, shall mean one happening or series of happenings, arising out of or due to one event taking place during the term of this policy" (or "contract" in the case of the Home poli-

cies). None of the policies in question was in effect during the time the Nicor MGPs at issue were operational.

On December 20, 1995, Nicor filed a declaratory judgment action against the Insurers. Home (joined by Lexington and Century) moved for summary judgment concerning policies issued between 1955 and 1976 on the ground that no "occurrences" as defined in the policies occurred during those years. The trial court granted the Insurers' motions for summary judgment, concluding that there was "only mere speculation that any occurrence, as defined in the policy, took place during the policy period."

Home (joined by Lexington and Century) also moved for summary judgment on the ground that Nicor was not "legally obligated to pay" for the investigation and remediation at the Aurora, Belvidere, Bloomington, Ottawa, and Streator sites. As noted above, the Lockport site was not included in the summary judgment motions made by these insurers because Nicor had been sued by a private party for response costs associated with contamination at that site. The trial court granted the summary judgment motions of these insurers on the grounds that the insurance contracts did not contain a duty to indemnify Nicor's voluntary cleanup actions and that there was no genuine issue of material fact which would preclude summary judgment in favor of the movant insurers.

We first consider whether the trial court erred in granting the Insurers' motions for summary judgment on the basis that Nicor voluntarily incurred expenses in investigating and cleaning the applicable sites. The relevant policy language provides the following:

> "Underwriters hereby agree to indemnify the ASSURED for all sums which the ASSURED shall be obligated to pay by reason of the liability imposed upon the ASSURED by law, or assumed by the ASSURED under contract or agreement, for damages *** on account of personal injuries and the property damage caused by or growing out of each occurrence."

The parties are in agreement that, while there are slight variations among the policies at issue, the basic wording is substantially the same.

Nicor claims that because it was legally obligated to pay the costs of responding to the contamination by reason of liability imposed by law or alternatively based upon its agreements with the IEPA, the Insurers were obligated to indemnify it for the costs incurred under the above policy language.

■ As a preliminary matter, our supreme court has held:

> "The construction of an insurance policy and a determination of the rights and obligations thereunder are questions of law for the

court which are appropriate subjects for disposition by way of summary judgment. [Citations.] In construing an insurance policy, the primary function of the court is to ascertain and enforce the intentions of the parties as expressed in the agreement. [Citations.] To ascertain the intent of the parties and the meaning of the words used in the insurance policy, the court must construe the policy as a whole, taking into account the type of insurance for which the parties have contracted, the risks undertaken and purchased, the subject matter that is insured and the purposes of the entire contract. [Citations.]" *Crum & Forster*, 156 Ill. 2d at 391.

■ In Illinois, the general rule "is that an insurer's duty to defend and its duty to indemnify are separate and distinct, with the duty to defend being broader than the duty to indemnify." *Douglas v. Allied American Insurance*, 312 Ill. App. 3d 535, 538-39, 727 N.E.2d 376 (2000). Here, the question is whether the Insurers were obligated to indemnify Nicor for remediation expenses under the policies.

This court recently held:

" '[T]he question of whether the insurer has a duty to indemnify the insured for a particular liability is only ripe for consideration if the insured has already incurred liability in the underlying claim against it.' [Citation.] In other words, the duty to indemnify arises when the insured becomes 'legally obligated' to pay damages in the underlying action that gives rise to a claim under the policy. One does not become legally obligated until a judgment or settlement is reached between the parties. [Citation.]" (Emphasis omitted.) *Guillen v. Potomac Insurance Co. of Illinois*, 323 Ill. App. 3d 121, 131-32, 751 N.E.2d 104 (2001).

Nicor suggests that *Zurich Insurance Co. v. Carus Corp.*, 293 Ill. App. 3d 906, 910, 689 N.E.2d 130 (1997), decided by this court, is not dispositive of the indemnification issue because the policies in *Carus* involved the duty to defend whereas the policies in this case are only indemnification policies. In *Carus*, the plaintiff-insurer sought a declaratory judgment action against the defendant-insured, Carus Corporation—a chemical manufacturer, under general liability policies issued to Carus by several insurers. The plaintiff sought a declaration as to whether the insurers owed Carus reimbursement for expenses incurred during an investigation of possible contamination in the soil and groundwater.

The policies in *Carus* stated the following:

" ' The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of:

Coverage A. bodily injury
Coverage B. property damage to which this insurance applies,

caused by an occurrence, and the company shall have the right and duty to defend any suits against the insured seeking damages ***.' " *Carus*, 293 Ill. App. 3d at 907.

In 1991, the IEPA and the United States Environmental Protection Agency (USEPA) made an assessment of the Carus chemical facility. Carus notified its insurers of the results of a site screening inspection (SSI) in 1992. In order to avoid being placed on the USEPA's national priorities list, Carus petitioned the IEPA to proceed under the site remediation program. In 1993, Carus was notified that the IEPA intended to conduct an SSI on certain property adjacent to the Carus chemical facility. Several of Carus's insurers were notified of this investigation and they denied coverage. In 1994, the IEPA notified Carus that hazardous substances had been found on the property.

In 1995, the plaintiff filed a declaratory judgment action seeking a determination that it had no duty to defend or to indemnify Carus in the absence of a lawsuit. All parties filed motions for summary judgment and the trial court granted the insurers' motions and denied Carus's motion. The issue in *Carus*, as defined by the court on appeal, was whether the insurers were "required to indemnify Carus for expenses incurred while participating in the IEPA's site remediation program." *Carus*, 293 Ill. App. 3d at 908.

■ Relying on the supreme court decisions in *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 607 N.E.2d 1204 (1992), and *Lapham-Hickey Steel Corp. v. Protection Mutual Insurance Co.*, 166 Ill. 2d 520, 655 N.E.2d 842 (1995), this court found that the insurers had no duty to defend or to indemnify Carus on the ground that the language in the policies required the environmental agencies to initiate a proceeding in a court of law in order for there to be coverage. *Carus*, 293 Ill. App. 3d at 910. Specifically, the court held:

> "The rule coming out of *Outboard Marine* and *Lapham-Hickey* is clear: an insurer's duty to defend and indemnify is triggered by a suit against the insured, and in the absence of a lawsuit, no such duty exists. Since no suit was brought against Carus, the insurers had no duty to defend or indemnify." *Carus*, 293 Ill. App. 3d at 910.

In *Lapham-Hickey*, the supreme court concluded that the word "suit" within an all-risks liability policy required an action in a court of law and did not apply to "allegations, accusations or claims which have not been embodied within the context of a complaint." *Lapham-Hickey*, 166 Ill. 2d at 532.

Nicor claims that the reasoning of *Carus* cannot control indemnity-only policies like the ones in the instant case because such an interpretation would render the policies "illusory" and no obligations

would be imposed on the insurers. We disagree, as discussed in detail below, because the issue is whether coverage under the instant policies was properly triggered by the voluntary efforts of remediation initiated by Nicor.

As pointed out above, Nicor contends that the holding in *Carus* is not dispositive because the policies therein contained language that the insurers had a duty to defend " 'any suits against the insured seeking damages.' " *Carus*, 293 Ill. App. 3d at 907. Thus, Nicor suggests that *Carus* was limited to policy language requiring that a "suit" be brought against the insured before the insurer had a duty to indemnify. Nicor points out that the indemnity-only policies in this case contain no language requiring that a suit be brought against the insured before the insurer can have any duty to indemnify. However, a reading of *Carus* reveals that the court also based its holding on the fact that Carus never became "legally obligated to pay" its investigation and remediation costs. *Carus*, 293 Ill. App. 3d at 910.

We also disagree with Nicor that the *Carus* court's reliance on the "obligated to pay" language was merely *dicta* because the court clearly stated that no document Carus ever received from an environmental agency triggered the obligation. *Carus*, 293 Ill. App. 3d at 910. The policy in the instant case reveals similar language, "Underwriters hereby agree to indemnify the ASSURED for all sums which the ASSURED shall be obligated to pay by reason of the liability imposed upon the ASSURED by law, or assumed by the ASSURED under contract or agreement, for damages." Thus, we find *Carus* to be controlling because it did not only rely on the "suit" language, but also considered the "obligated to pay" language, which is similar to the policy language at issue in this case.

We have also examined the foreign authority relied upon by Nicor in which courts have interpreted the duty to indemnify as it relates to similar policy language and find it unpersuasive.

In *Upjohn Co. v. New Hampshire Insurance Co.*, 178 Mich. App. 706, 716-17, 444 N.W.2d 813, 817 (1989), Upjohn, a pharmaceutical company, sued its liability or excess liability carriers claiming coverage under those policies for its environmental contamination of the groundwater. The Court of Appeals of Michigan interpreted policy language that was nearly identical to the policy language at issue in the instant case. In *Upjohn*, one policy provided that the insured would be indemnified "for all sums which the Insured shall be obligated to pay by reason of liability imposed on the Insured by law, or liability assumed under contract or agreement; for all damages *** on account of *** property damage." *Upjohn*, 178 Mich. App. at 717, 444 N.W.2d at 818. In another policy, the language provided: "The

company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of *** property damage to which this insurance applies ***." *Upjohn*, 178 Mich. App. at 718, 444 N.W.2d at 818.

The reviewing court observed that the governmental agencies could have ordered Upjohn to act, and had they done so, Upjohn would have been legally obligated to pay the cleanup costs. *Upjohn*, 178 Mich. App. at 719-20, 444 N.W.2d at 819. Therefore, the court determined that Upjohn's voluntary cleanup efforts were compensable under the policies. *Upjohn*, 178 Mich. App. at 719, 444 N.W.2d at 819. The court further found that remedial action should be encouraged prior to an order to do so because of the government and citizens' interest in the natural resources. *Upjohn*, 178 Mich. App. at 719-20, 444 N.W.2d at 819.

*Upjohn* is unpersuasive for two reasons. First, the decision was reversed by the Supreme Court of Michigan in *Upjohn Co. v. New Hampshire Insurance Co.*, 461 N.W.2d 486 (Mich. 1990). Although the reversal was on other grounds, we decline to rely on this authority. Second, in *Upjohn*, the Court of Appeals of Michigan determined that because an environmental agency "could have" ordered a cleanup, Upjohn "would have" been legally obligated to pay cleanup costs. We not only find this rationale faulty, but in this case, the unrefuted testimony of James Janssen also established that no representation was ever made to Nicor that it was legally obligated to enroll its sites in the voluntary cleanup program or that the program was adversarial. As a result, Nicor was not legally obligated to pay for the cleanup costs pursuant to an instruction by the IEPA or any other governmental agency. Because Janssen's testimony affirmatively established that no liability was imposed upon Nicor by law, we conclude that coverage was not triggered under the instant policies.

In *Bausch & Lomb, Inc. v. Utica Mutual Insurance Co.*, 330 Md. 758, 779-80, 625 A.2d 1021, 1031-32 (1993), Bausch & Lomb, a manufacturer of health care and optical products, sought coverage under several commercial general liability policies for contamination that occurred at a manufacturing site in Maryland. The language in the policies was similar to the policies in this case. The language in the standard Bausch & Lomb policies provided:

> "The company [Utica] will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... property damage to which this insurance applies caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such property damage." *Bausch & Lomb*, 330 Md. at 764, 625 A.2d at 1024.

Also, the reviewing court in *Bausch & Lomb* recognized that the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) (42 U.S.C. § 9601 *et seq.* (1994)) allowed the federal government broad power to combat contamination of the environment, including: the invocation of an injunction requiring the contaminator to clean up a contaminated site; the authority to clean up the site and seek reimbursement from the contaminator; or the power to issue an administrative order requiring the responsible party to perform the cleanup subject to civil fines for failure to comply. Further, under the Maryland code, a party responsible for pollution was subject to strict liability, and the state could require a contaminator to remediate a site through an injunction or perform the remediation itself at the expense of the contaminator.

In February of 1983, the Maryland State Waste Management Administration included Bausch & Lomb's site on the master list of potentially hazardous sites. The Director of Waste Management Administration testified that, once the state had listed a property as a potentially hazardous site, the property owner no longer had the option of doing nothing. Instead, the Director stated that Bausch & Lomb's posture in response to remediating the pollution was one of "uncontested compliance" with state laws and regulations.

The parties conceded that the relevant environmental statutes imposed strict liability upon the owners of polluted property and that the state could enforce these environmental laws by administrative order, injunction, or direct remediation at the owner's expense. The Court of Appeals of Maryland found that, although the state filed no suit or issued any order, the tacit threat of state intervention through Maryland environmental regulations satisfied the requirement that the contaminator was legally obligated to pay. *Bausch & Lomb*, 330 Md. at 779-80, 625 A.2d at 1031-32.

*Bausch & Lomb* is also distinguishable from the instant case for the same reason noted in *Upjohn* above. Here, Janssen unequivocally testified that Nicor had no legal obligation for cleanup costs. In contrast, the Director of Waste Management Administration in Bausch & Lomb made clear that the company could either clean up the site on its own volition or do so under an injunction imposed by the state. The IEPA position in this case is different from the Maryland environmental agency in *Bausch & Lomb*. As a result, the tacit threat of state action which existed in *Bausch & Lomb* was not present in this case.

In *Weyerhaeuser Co. v. Aetna Casualty & Surety Co.*, 123 Wash. 2d 891, 893, 874 P.2d 142, 144 (1994), the Weyerhaeuser Company filed a declaratory judgment action against many of its insurers seeking

coverage with respect to expenses incurred in remediating a variety of its polluted sites. The policies involved were excess comprehensive general liability policies that contained language virtually identical to the policies in the instant case. The facts showed that Weyerhaeuser site remediation managers submitted affidavits that the work undertaken was mandated by state and federal statutes which imposed strict and joint and several liability for pollution damage.

Weyerhaeuser's insurers filed a motion for summary judgment with respect to 18 sites on the basis that the government environmental agencies involved had not yet filed legal actions or threatened to do so. The trial court granted summary judgment on that ground with respect to 15 sites. Under Washington State's Model Toxics Control Act, based, in part, upon CERCLA, owners and operators of contaminated facilities are strictly liable for remediation costs resulting from the release or threat of release of hazardous substances. Wash. Rev. Code § 70.105D.040(2).

The question presented in *Weyerhaeuser* was whether a duty to indemnify existed under a commercial general liability policy for property damage when the insured had incurred environmental cleanup costs, but the involved governmental agency had not made an overt threat of formal legal action. In reliance on *Bausch & Lomb*, cited above, the Supreme Court of Washington found that an insurer may be legally obligated to pay for property damage by reason of state environmental statutes when an insured engages in the voluntary cleanup of contamination in cooperation with an environmental agency. *Weyerhaeuser*, 123 Wash. 2d at 896, 874 P.2d at 145. The Supreme Court of Washington also observed that Weyerhaeuser officials claimed that "as to all sites, Weyerhaeuser was acting *under government mandate* to comply with applicable environmental statutes." (Emphasis added.) *Weyerhaeuser*, 123 Wash. 2d at 905, 874 P.2d at 149.

We conclude that *Weyerhaeuser* is distinguishable from the instant case. In *Weyerhaeuser* and *Bausch & Lomb*, it was less certain that the polluting companies acted voluntarily in remediating the contamination. The facts in both cases suggest that, while no formal action had been taken by an environmental agency, such action was imminent absent the companies' full cooperation in the cleanup. Here, Janssen, an IEPA representative, affirmatively testified that Nicor was not "legally obligated" to remediate the sites and that the voluntary cleanup program was "non-adversarial." Robert O'Hara also testified that the site remediation program was voluntary as opposed to action taken by the IEPA under section 4(q) of the Environmental Protection Act (415 ILCS 5/4(q) (West 1998)). Thus, the tacit threat of agency ac-

tion that existed in *Weyerhaeuser* and *Bausch & Lomb* is not present in this case. In any event, we do not find that a tacit threat from an agency amounts to a liability imposed upon the insured by law.

In *Compass Insurance Co. v. Cravens, Dargen & Co.*, 748 P.2d 724, 729 (Wyo. 1988), the State of Wyoming was issued a commercial general liability policy from Compass Insurance Company and a property insurance policy from Cravens, Dargen and Company (Cravens). A vandal opened the valve on a storage tank owned and controlled by the State of Wyoming resulting in an oil spill which damaged state property and the property of adjacent landowners. The state made claims against Compass and Cravens in the amount of $96,792 for costs associated with cleaning up the oil spill and the value of the oil spilled. Cravens paid the entire claim and sought reimbursement from Compass as subrogee of the state. Compass asserted that it had no duty to the state or to Cravens for any expenses associated with the oil spill.

The Compass policy contained the "legally obligated to pay as damages" language similar to the language at issue in the instant case. The Supreme Court of Wyoming determined that the State of Wyoming was required to pay for the cleanup pursuant to the Wyoming Environmental Quality Act. It further held that the insurer could not deny indemnification for cleanup costs on the basis that no formal environmental claims had been filed. The court reasoned that the principles of good faith and reasonableness required an insurer to encourage immediate cleanup efforts so as not to cause greater environmental damage and associated remediation costs.

*Compass* is also distinguishable from the instant case because it did not involve the issue of whether the policy language was triggered by a voluntary undertaking to remediate contamination by the insured. In *Compass*, the state took immediate action for the cleanup under its statutory directive and then sought reimbursement from its insurers for the remediation costs. Cravens paid the claim and then sought reimbursement from Compass. These facts are not similar to those present here. As pointed out above, the record indicates that Nicor was not legally obligated to pay property damages because the IEPA representatives testified that its action against Nicor was nonadversarial. Thus, under the instant policy language, which requires that a "liability [be] imposed upon the insured by law," a finding of coverage would be improper. Further, under the facts in this case, we do not agree that an insurer has a good-faith duty to indemnify the insured in the event of environmental contamination unless the insured has been obligated by law to pay damages. Such a result flies in the face of the agreement between the insured and the insurer and

risks affording the insured expanded coverage to which it is not entitled.

Finally, in *Metex Corp. v. Federal Insurance Co.*, 290 N.J. Super. 95, 107, 675 A.2d 220, 226 (1996), Metex, a wire mesh manufacturer, became concerned that its method for storing hazardous substances at a certain New Jersey site was not in compliance with state and federal environmental regulations. The New Jersey Spill Compensation and Control Act (Spill Act) (N.J. Stat. Ann. § 58:10—23.11 (West 1992)) imposed strict liability for the cost of the cleanup on the responsible party.

The Superior Court of New Jersey interpreted a primary commercial general liability policy that required the insurer to " 'pay damages the insured becomes legally obligated to pay by reason of liability imposed by law or assumed under any contract or agreement because of *** property damage.' " *Metex*, 290 N.J. Super. at 103, 675 A.2d at 224. While the New Jersey Department of Environmental Protection had offered Metex an opportunity to enter into an agreement regarding the contemplated cleanup, no third party had ever filed a lawsuit or issued an agency directive against Metex to remediate the contamination. A consultant for Metex determined that the cleanup costs to remediate the contamination would be $3,144,000, and subsequent operation and maintenance would cost $430,000 per year. Metex sought reimbursement of these costs from several of its insurers that issued third-party comprehensive general liability policies. The insurers denied coverage and Metex filed a declaratory judgment action. The insurers moved for summary judgment on the ground that, in the event damage was suffered by third parties, there was no evidence that any action was taken by a third party that established a legal obligation to pay any damages. Under the policy, therefore, the insurers argued that there was no coverage. The trial court agreed and granted the insurer's motion for summary judgment.

On review, the Superior Court of New Jersey held that, "it is this statutory mandate [under the Spill Act] that makes a polluter legally obligated to pay damages because of property damage." *Metex*, 290 N.J. Super. at 104, 675 A.2d at 225. Based on *Weyerhauser* and *Bausch & Lomb*, the court concluded that Metex was entitled to coverage under the primary policy. *Metex*, 290 N.J. Super. at 107, 675 A.2d at 226.

In regard to various excess and umbrella policies issued after 1978, the policy language made several different promises to pay damages as the insured became legally obligated to pay, such as a promise to indemnify Metex for the ultimate net loss sustained by reason of liability because of property damage. Some of the policies expressly

defined ultimate net loss as " 'the sums paid or payable as damages in settlement of a claim or in satisfaction of a judgment for which [Metex] is legally liable after making proper deduction for all recoveries and salvages ....' " *Metex*, 290 N.J. Super. at 108, 675 A.2d at 227. The trial court did not address the issue of whether the different "ultimate net loss" language set forth in the umbrella and excess liability insurance policy definitions provided coverage. The superior court remanded the issue to the trial court with regard to whether coverage had been invoked under the umbrella and excess liability policies. *Metex*, 290 N.J. Super. at 108-09, 675 A.2d at 227.

In reaching its conclusion regarding the primary policy, the *Metex* court relied upon the Spill Act, which imposed strict liability upon polluters, not whether an order was issued by an environmental agency, for the purpose of determining coverage under the language of the policy. Thus, it held that the action of the environmental agency was irrelevant because the statutory mandate of the Spill Act triggered coverage. We reject such an interpretation of the instant policy language. In our view, a "liability imposed upon the insured by law" is not triggered by the mere existence of a statute that imposes strict liability upon polluters.

The *Metex* court also adopted the reasoning from the holdings in *Weyerhaeuser* and *Bausch & Lomb*. We have already held above that this case is distinguishable from *Weyerhaeuser* and *Bausch & Lomb*. Thus, we also reject the reasoning in *Metex* with regard to the primary policy in that case. In sum, we are not persuaded by the reasoning in any of the foreign decisions relied upon by Nicor.

In *Certain Underwriters at Lloyd's of London v. Superior Court*, 24 Cal. 4th 945, 950, 16 P.3d 94, 97, 103 Cal. Rptr. 2d 672, 675 (2001), the Supreme Court of California determined that an insurer's duty to indemnify the insured under a standard comprehensive general liability insurance policy for "all sums that the insured becomes legally obligated to pay as damages" is limited to money ordered by a court.

In so holding, the court in *Lloyd's* relied upon *Carus* and a decision from the Supreme Court of Maine, *Patrons Oxford Mutual Insurance Co. v. Marois*, 573 A.2d 16 (Me. 1990). *Lloyd's*, 24 Cal. 4th at 964, 16 P.3d at 106, 103 Cal. Rptr. 2d at 685. In *Patrons*, the court found the that the " 'legally obligated to pay as damages' " language in a special multiperil policy did not cover expenses incurred by the insured in meeting state remediation demands. *Patrons*, 573 A.2d at 16. The court reasoned that its "role here is simply to determine the meaning of a private contract between these parties, not to foster or retard environmental goals." *Patrons*, 573 A.2d at 17. The court further found that the language, " 'legally obligated to pay as damages,' " was

not ambiguous, meaning that it did not encompass expenses which may be incurred to halt continuing pollution and property damage. *Patrons*, 573 A.2d at 18-19.

The *Lloyd's* court determined that limiting the policy language at issue to money ordered by a court imposes a bright-line rule ensuring efficiency and fairness by increasing certainty and decreasing uncertainty about the duty to indemnify. Such certainty serves to deter some litigation and fosters the expeditious resolution of those issues not deterred. *Lloyd's*, 24 Cal. 4th at 966, 16 P.3d at 107, 103 Cal. Rptr. 2d at 686.

The court further concluded that "the duty to indemnify does not extend to any expenses required by an administrative agency pursuant to an environmental statute." *Lloyd's*, 24 Cal. 4th at 966, 16 P.3d at 107, 103 Cal. Rptr. 2d at 686. It reasoned that "the expenses required by an administrative agency pursuant to an environmental statute, whether for the cleanup of a contaminated site and the abatement of the contamination's effects or otherwise, do not constitute money ordered by a court." *Lloyd's*, 24 Cal. 4th at 966, 16 P.3d at 107, 103 Cal. Rptr. 2d at 686.

The court also held that it would not rewrite the provision in order to shift to the insurer some or all of the potentially substantial costs that might be imposed on the insured as the result of an administrative hearing held pursuant to an environmental statute. *Lloyd's*, 24 Cal. 4th at 966, 16 P.3d at 107, 103 Cal. Rptr. 2d at 686. Moreover, it would not rewrite the provision for considerations of public policy to promote the shifting of costs to advance the cleanup of a contaminated site and the abatement of the contamination's effects by calling in the insurer's resources to supplement those of an insured. *Lloyd's*, 24 Cal. 4th at 966, 16 P.3d at 107, 103 Cal. Rptr. 2d at 686.

Finally, the court reasoned that rewriting the provision would curtail the parties' freedom to contract because the insurers may be required to provide more coverage than they promised and would allow the insured to receive more than it paid for. *Lloyd's*, 24 Cal. 4th at 966, 16 P.3d at 107, 103 Cal. Rptr. 2d at 686.

Having reviewed the decisions cited by Nicor and the *Lloyd's* opinion, we find the decision in *Lloyd's* to be more persuasive. However, we need not adopt the holding in *Lloyd's*, which limits the duty to indemnify an insured to money damages ordered by a court, because the remediation efforts undertaken here were purely voluntary.

We also observe that there is authority from Illinois which supports the conclusion that the duty to indemnify is limited to a judgment entered by a court of law. In *Guillen*, cited above, the defendant-

insurer issued an insurance policy to certain property owners. The plaintiffs-tenants in one of the insureds' buildings filed a complaint against the insureds because the minor plaintiff was exposed to lead while living at the building. The original policy did not contain a lead exclusion provision, but two policies issued for subsequent periods included lead exclusion language. The insured tendered the plaintiffs' claims to the defendant. The defendant denied coverage on the grounds that it had no duty to defend because the lead exclusion barred coverage and that it had no duty to indemnify because it was not " 'legally obligated to pay damages to the plaintiff, because no judgment exist[ed].' " *Guillen*, 323 Ill. App. 3d at 126.

As we noted above, this court held: "the duty to indemnify arises when the insured becomes 'legally obligated' to pay damages in the underlying action that gives rise to a claim under the policy. One does not become legally obligated until a judgment or *settlement* is reached between the parties." (Emphasis in original.) *Guillen*, 323 Ill. App. 3d at 132. While *Guillen* involved neither MGPs, environmental contamination, nor a voluntary undertaking on behalf of the insured to remediate contaminated sites, it did involve the interpretation of similar policy language.

The *Guillen* court relied upon language in *Douglas*, cited above, which held that, "[i]t is clear that in a lawsuit one does not become 'legally obligated' until a judgment or settlement is reached between the parties." *Douglas*, 312 Ill. App. 3d at 541. In *Douglas*, the reviewing court observed that "legally obligated" was not defined in the policy, but found the terms' plain meaning suggested an obligation due to judgment or settlement. *Douglas*, 312 Ill. App. 3d at 541. The court further found that Black's Law Dictionary stated, "a legal obligation forms the basis for a judgment in a court of competent jurisdiction," citing Black's Law Dictionary 806 (5th ed. 1971). *Douglas*, 312 Ill. App. 3d at 541. The court also relied upon the supreme court's decision in *Zurich Insurance Co. v. Raymark Industries Inc.*, 118 Ill. 2d 23, 52, 514 N.E.2d 150 (1987), which held, "[t]he duty to indemnify arises only when the insured becomes legally obligated to pay damages in the underlying action that gives rise to a claim under the policy." *Douglas*, 312 Ill. App. 3d at 540-41. The court in *Raymark* explained that the primary insurers were obligated to defend new claims until the time the liability limits of those policies were exhausted by the payment of judgments or settlements. *Raymark*, 118 Ill. 2d at 53; *Douglas*, 312 Ill. App. 3d at 540. Thus, the *Douglas* court concluded that "one does not become 'legally obligated' until a judgment or settlement is reached between the parties." *Douglas*, 312 Ill. App. 3d at 541.

■ Although the policies in *Guillen, Douglas,* and *Raymark* contained a duty to defend as well as a duty to indemnify and the instant policies concern the duty to indemnify only, we still conclude, reading the policies as a whole, that an insurer's duty to indemnify the insured for "all sums the ASSURED shall be obligated to pay by reason of liability imposed upon the ASSURED by law *** for damages" is triggered by a judgment rendered by a court. Thus, coverage was not triggered in the instant case because Nicor voluntarily undertook cleanup efforts, and the actions of the IEPA were nonadversarial and did not amount to a court judgment against Nicor.

We agree with the reasoning in *Lloyds* that while the immediate cleanup of environmental contamination should be encouraged, the polluter should not be allowed to shift to the insurer some or all of the costs that might be imposed on the insured at the end of a proceeding conducted by an administrative agency pursuant to an environmental statute. *Lloyd's,* 24 Cal. 4th at 967-68, 16 P.3d at 108, 103 Cal. Rptr. at 687.

We also conclude that the trial court correctly held that no material question of fact existed that would preclude summary judgment on the issue. As Lexington observed in its brief, the record revealed that the IEPA never issued a section 4(q) notice of potential liability to Nicor under the Environmental Protection Act. 415 ILCS 5/4(q) (West 1998). Further, no evidence demonstrated that any court action or administrative proceeding had been brought against Nicor by the IEPA. Instead, the record indicated that Nicor, on its own volition, enrolled the sites at issue into the site remediation program. Because Nicor could not offer any evidence that it was obligated to pay these remediation costs by reason of liability imposed upon it by law, we find that summary judgment was proper.

Because our ruling on the first question is dispositive of this appeal, we need not consider whether the trial court erred in granting the Insurers' motions for summary judgment on the ground that the environmental contamination at the various sites did not constitute "occurrences" under the policies at issue. For the reasons above, we affirm the order of the trial court.

Affirmed.

CAHILL and BURKE, JJ., concur.