CENTRAL ILLINOIS LIGHT COMPANY, Plaintiff-Appellant and Cross-Appellee, v. HOME INSURANCE COMPANY, Defendant-Appellee and Cross-Appellant (Certain Underwriters at Lloyds London *et al.*, Defendants-Appellees and Cross-Appellants).

Third District   No. 3—02—0415

Opinion filed August 7, 2003.

Stephen R. Kaufman, Charles J. Northrup, and Thomas H. Wilson (argued), all of Sorling, Northrup, Hanna, Cullen & Cochran, Ltd., of Springfield, Karen K. Poulos, of Howrey, Simon, Arnold & White, of Chicago, and Lester O. Brown and Thomas M. McMahon (argued), both of Howrey, Simon, Arnold & White, of Los Angeles, California, for appellant.

James S. Stickles, Jr. (argued), and Laura J. McGrath, both of Kaplan & Von Ohlen, of Chicago, for appellee Home Insurance Company.

David B. Collins and R. Michael Henderson, both of Quinn, Johnston, Henderson & Pretorious, Chtrd., of Peoria, and Neal M. Glazer and Jan Duffalo (argued), both of D'Amato & Lynch, of New York, New York, for other appellees.

JUSTICE SLATER delivered the opinion of the court:

The plaintiff, Central Illinois Light Company (CILCO), brought this action seeking indemnification under comprehensive liability policies issued between 1948 and 1985 by the defendants, the Home Insurance Company (Home) and Certain London Market Insurers (CLMI), for environmental liabilities at three former manufactured gas plants (MGPs). The defendants filed nine motions for summary judgment and partial summary judgment. The trial court granted five of those motions. The plaintiff is appealing the trial court's order granting three of those motions. The defendants have cross-appealed the trial court's denial of three summary judgment motions filed by them. We affirm in part and reverse in part the orders of the trial court.

# I. FACTS

## A. Background

### 1. *The MGP Sites*

The environmental liabilities at issue in this case arose at three former MGP sites in Illinois: MacArthur Boulevard in Springfield (MacArthur), First and Washington Streets in Springfield (First and Washington) and Persimmon Street in Peoria (Persimmon) (collectively, the MGP sites). Gas was manufactured at these sites from the 1850s until the 1930s, using both coal carbonization and carbureted water gas processes. One of the main by-products of both gas making processes was tar, which was extracted, stored and sold at each of the MGP sites. Various tar containment structures were used at the sites. Generally, these containment structures were built underground out of masonry, concrete or metal. After natural gas pipelines were developed in the mid-1900s, MGPs began to be dismantled. CILCO dismantled the First and Washington MGP in the late 1920s and the Persimmon and MacArthur MGPs in the early 1950s. During the dismantling process, the covers of the structures were removed and the tar was extracted and sold. However, not all of the tar could be removed. Significant amounts of tar remained in the structures, which were then filled with building debris or other materials. Over time, the underground containment structures leaked tar into the soil. Those leaks were caused by a myriad of reasons, including cracks, breaks, seismic shifts, vibrations from traffic, precipitation, changes in groundwater levels and flooding. The leaking of this tar and other tar-related constituents has caused soil and groundwater contamination. CILCO has spent over $5 million to investigate, remediate and mitigate environmental property damage, including soil and groundwater contamination, at and around these MGP sites. CILCO claims that the property damage occurred at the MGP sites throughout the period of the defendants' policies.

### 2. *Investigation and Cleanup at the MGPs*

In 1985, after reviewing a report from the Environmental Protection Agency regarding possible environmental contamination at some MGP sites, CILCO learned that it owned the former MGP sites at issue in this case. In 1985 and 1986, CILCO visually inspected the former MGP sites but did not observe any evidence of contamination. In September 1986, workers found discolored and odorous soil at the MacArthur site. CILCO began a Phase I environmental investigation at the site. A preliminary investigation report was issued in April 1987 and concluded that tar constituents were present in the soil.

Thereafter, the Illinois Environmental Protection Agency (IEPA) held a meeting with the environmental department managers for Illinois utility companies, including CILCO. At that meeting, CILCO learned about the potential environmental contamination at hundreds of former MGPs throughout Illinois.

In 1987, the IEPA entered into an agreement with CILCO whereby CILCO would enroll the MGP sites in the IEPA's Pre-Notice Site Cleanup Program (Pre-Notice Program) and investigate and remediate, if necessary, the MGP sites one at a time. When CILCO enrolled in the Pre-Notice Program, the work at the MGP sites became subject to specific IEPA guidelines and instructions on how to proceed. The IEPA regularly reviewed, commented upon, and approved the work plans and reports prepared by CILCO. CILCO did not proceed with remediation until the IEPA had approved the work plans. Additionally, the IEPA regularly sent invoices to CILCO for "oversight costs," *i.e.*, the time spent by IEPA employees in overseeing the investigation and remediation work. The Pre-Notice Program was replaced in 1995 by the Site Remediation Program, which also provided for voluntary cleanup of certain types of sites with IEPA oversight.

Pursuant to the Pre-Notice Program, CILCO began a Phase II investigation of the MacArthur site between 1988 and 1989. Groundwater contamination at this site was discovered in 1989. CILCO submitted a remedial action work plan to the IEPA in 1990. That plan was approved, and work at the MacArthur site was completed in 1991.

In 1991, CILCO began investigating the Persimmon site. In 1992, the preliminary investigation of the Persimmon site concluded that there was a high probability of contamination at the site. Remedial investigation/feasibility study work and field sampling plans for the Persimmon site were completed and submitted to the IEPA in September 1992. In 1993, CILCO acknowledged that contamination existed at the site. The IEPA approved CILCO's work plan for further site investigation. Cleanup of that site was completed in 1998.

The IEPA sent "No Further Action" letters for the MacArthur and Persimmon sites in 1999 and 2000, respectively. Those letters stated that CILCO was released from further responsibilities under the Illinois Environmental Protection Act.[1] 415 ILCS 5/1 *et seq.* (West 2002).

### 3. *The Vector-Springfield Litigation*

In June 1989, CILCO was advised by the developer of property

---

[1]At the time CILCO filed this suit, it had not begun to remediate the First and Washington site. Therefore, the trial court dismissed that site from the complaint for lack of justiciability. CILCO does not appeal that ruling.

adjacent to the First and Washington site that its property, located at First and Adams, was contaminated. CILCO later received a copy of an investigation report prepared by Hanson Engineers which stated that constituents of tar had been found in soil and groundwater at the First and Adams property. CILCO met with the developer in 1989 and 1990, but CILCO did not agree with the developer's proposals. In 1994, Vector-Springfield, the owners of the First and Adams property, threatened CILCO with a lawsuit, which was ultimately filed. The suit was eventually dismissed on statute of limitations grounds. CILCO expended approximately $350,000 in defending that lawsuit. No judgment was entered against CILCO, and no settlement payment was made to Vector-Springfield.

## B. The Insurance Policies

Between 1948 and 1985, CLMI and Home issued a series of occurrence-based comprehensive liability policies which provide coverage for sums that CILCO becomes liable to pay with respect to occurrences of property damage. It is the wording of these policies that is at issue in this case.

### 1. *The Home Policies*

We initially note that CILCO did not bring suit against Home with respect to the MacArthur site. Therefore, Home is potentially liable only for the costs associated with the Persimmon site.

Home issued one first-layer excess policy to CILCO and two second-layer excess policies. Home Policy No. HEC 9 30 46 82 (Home I), effective May 31, 1968, to September 30, 1968, states that it follows the form of an underlying CLMI excess policy. Home I's coverage was for 10% of a $4 million layer that attached in excess of $1 million. The trial court dismissed Home I because the underlying CLMI policy was missing.

Home Policy No. HEC 9 30 46 83 (Home II), effective September 30, 1968, to October 31, 1971, follows the form of an underlying CLMI excess policy effective between 1968 and 1971. Home II's coverage was 10% of a $4 million layer that attached in excess of $1 million.

Home Policy No. HEC 4 16 58 35 (Home III) is a first-layer excess indemnity policy, effective October 31, 1971, through September 3, 1974, that sits above a $100,000 self-insured retention. The relevant terms and conditions of Home III are as follows:

"**INSURING AGREEMENTS**

I. The Company agrees to indemnify the Named Insured for ultimate net loss in excess of the retained limit hereinafter stated which the Named Insured may sustain by reason of the liability imposed upon the Named Insured by law or assumed by the named

Insured under contract or agreement, for damages *** caused by an occurrence as defined herein.

\* \* \*

III. Limit of Liability—Retained Limit

The Company's limit of liability shall be only for the ultimate net loss in excess of $100,000.00 as a result of any one occurrence and then only up to an amount exceeding $1,000,000.00 for such occurrence. *** There is no limit to the number of occurrences for which claims made be made hrerunder [sic], provided such occurrences begin during the policy period.

\* \* \*

**CONDITIONS**

D. DEFINITIONS

(C) 'Ultimate Net Loss' means the sum actually paid in cash in the settlement or satisfaction of losses for which the insured in [sic] liable, either by adjudication or compromise with the written consent of the company, after making proper deductions of all recoveries, (other than recoveries from underlying insurance purchased by or in [sic] behalf of the insured), and salvages collectible, and shall include all adjustment expenses arising from the settlement of claims, other than salaries of employees and office expenses of the insured, but shall exclude legal expenses. Nothing herein contained shall be construed to mean that the insured shall be required to enforce by legal action any rights of subrogation before the company shall pay any loss for which it may be liable hereunder. Except as provided in Condition G, legal expenses (including attorneys' fees, court costs and interests on any judgment or award) incurred with the consent of the company shall be apportioned in proportion to the respective interests as finally determined.

G. LEGAL EXPENSES

In the event of an occurrence which may involve liability on the part of the company, the company shall, except in the case of appeal, or as provided in Condition L, contribute to the legal expenses in the proportion that its share of the loss, as finally settled, bears to the total sum payable. Where multiple claims result from the same occurrence, apportionment of such expenses between the insured and the company will be made at the time of settlement of the first claim for which the company is liable under the contract and on each subsequent claim resulting from the same occurrence, reapportionment of legal expenses incurred to that time will be made, to the end that the insured will not be required to advance the entire legal expenses without reimbursement until the final claim is disposed of."

## 2. *The CLMI Policies*

In its complaint, CILCO names 72 alleged CLMI excess policies spanning the years 1948 until 1985. CILCO has not produced any policy wording for the pre-1957 policies or for several other post-1957 policies. In the 1957 policies through 1971 policies, CLMI agreed:

"to indemnify [the insured] for any and all sums which the Insured shall by law become liable to pay and shall pay or by final judgment be adjudged to pay, or which by agreement between the Insureds and the Underwriters, or their representatives shall be paid to any person [or] firm \*\*\* as damages for personal injuries \*\*\* or damage[2] to property (excluding damage to property owned by the Insured) by reason of an occurrence resulting from the Insured's \*\*\* ownership, maintenance, operation, use of or liability for properties of all kinds and nature."

For the lower layer policies after 1979, CLMI agreed, subject to all terms, conditions, exclusions and limitations of the policies, to indemnify CILCO:

"for all sums which the Assured shall be obligated to pay by reason of the liability:

(a) imposed upon the Assured by law, or

(b) assumed under contract or agreement with the Named Assured for damages on account of:

(i) Bodily Injury

(ii) Property Damage caused by or arising out of each occurrence happening within the United States of America."

The higher layer policies after 1979 follow form in relevant part to the lower layer policies. The limit of CLMI's monetary obligation is to pay the amount of "ultimate net loss" that is in excess of any retained limit or underlying insurance, and not greater than the upward limit of the particular policy. CLMI's earlier policies define "ultimate net loss" as "the sums for which the Insured is liable in settlement of an occurrence." Later policies define the term "ultimate net loss" as "the total sum which the Assured \*\*\* become[s] obligated to pay by reason of bodily injuries or property damage claims, either through adjudication or compromise, excluding all expenses and costs."

## C. The Missing Policies

CILCO does not have copies of all of the policies issued to it by the defendants. Specifically, CLMI policies from the years 1948 through 1957 and 1974 through 1985 could not be located. According to CILCO, it searched its own insurance department files, as well as its insurance brokers' files. Through the efforts of an insurance archeology firm,

---

[2]Some policies contain the word "damage," others do not.

CILCO obtained certain records from London market brokers who had been involved in the placement of the missing policies. CILCO requested formal discovery from CLMI regarding the missing terms or policies. CILCO served a production request for insurance policies, but CLMI only produced a few policies. CILCO also requested that CLMI provide discovery regarding the drafting history of the policies and claim files from other MGP insurance coverage cases in an effort to find analogous or standard policy language.

The trial court denied CILCO's motions to compel the requested discovery. CILCO's motion for reconsideration was also denied. When the defendants moved for summary judgment on the missing policies, CILCO sought additional discovery of sample or specimen policy language. That request was also denied when the trial court granted the defendants' missing policy motion.

CILCO presented to the trial court secondary evidence of most of the missing policies, such as placing slips, correspondence and evidence of reinsurance. These documents contained the dates of the policies, the identities of the insurer and insured, the type of coverage provided, the dollar limits of coverage and the premiums paid. CILCO also filed additional policy evidence indicating that CILCO had insurance coverage with London Market insurers as far back as the 1930s. The evidence also showed that the relevant language at issue in the defendants' summary judgment motions remained virtually the same as far back as 1938.

## D. Procedural History

On June 23, 1997, CILCO filed a complaint for declaratory judgment and breach of contract against the defendants. On March 17, 2000, the defendants filed summary judgment motions. Hearings on the motions were held on June 13, 2000, and September 11, 2000. The trial court issued its ruling on March 7, 2002. The trial court granted the following motions for summary judgment: (1) CLMI's motion for partial summary judgment based on CILCO not having been legally obligated to pay "as damages" (for the MacArthur and Persimmon sites) and Home's joinder thereto; (2) CLMI's motion for summary judgment dismissing purported CLMI policies that were missing and Home's joinder as to the Home policy number HEC 9 30 46 82; (3) Home's motion for partial summary judgment that Home had no duty to pay legal expenses; (4) Home's motion for partial summary judgment that Home had no duty to defend, and CLMI's joinder thereto. Additionally, the trial court treated Home's motion for partial summary judgment based on lack of justiciability with respect to the First and Washington sites, and Home's joinder thereto, as a motion to

dismiss, and granted that motion. In granting the defendants' summary judgment motion on the indemnity issue, the trial court held that it was difficult to determine when an insured shall become "legally obligated" or "liable" to pay for environmental cleanup expenses. However, the court noted that it was bound by a First District Appellate Court decision which mandated that a "suit" be filed against an insured in order for an insurer to be required to indemnify the insured for such costs. See *Zurich Insurance Co. v. Carus Corp.*, 293 Ill. App. 3d 906, 689 N.E.2d 130 (1997).

The trial court denied the following motions for summary judgment filed by the defendants: (1) trigger of coverage; (2) late notice; (3) First and Washington liability not arising out of CILCO's operations; and (4) "Sudden, Unintended and Unexpected Pollution Exclusion."

On May 6, 2002, the trial court issued its order on the motions for summary judgment and entered judgment in favor of the defendants and against CILCO on CILCO's claim for declaratory relief and breach of contract.

## II. ANALYSIS

### A. Indemnification under CLMI and Home's Policies

On appeal, CILCO first argues that the trial court erred in granting summary judgment in favor of CLMI and Home on the issue of coverage when it found that CILCO was not "legally obligated" to pay the environmental clean up costs associated with the MGPs as "damages" in the absence of a "suit" against CILCO. CILCO contends that the trial court's ruling is contrary to the plain language of CILCO's indemnity-only policies, which do not require a "suit" but only a "legal obligation" to pay "damages" for property damage. Further, CILCO notes that it is "legally obligated" to remediate environmental contamination at its MGP sites under federal and state environmental laws and regulations. See 42 U.S.C. § 9601 *et seq.* (2000); Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA); 415 ILCS 5/22.2 (West 2002). In addition, CILCO claims that the court's ruling on this issue is based upon an erroneous application of Illinois case law. CILCO also contends that the trial court's ruling requiring a "suit" before there is an indemnity obligation under the policies is contrary both to CILCO's duty to mitigate its damages and to public policy. Finally, CILCO argues that the MGP cleanup expenses are obligations "assumed by contract" under the policies.

In response, Home[3] argues that the trial court correctly ruled that Home had no coverage obligations in connection with the Persimmon site because CILCO was never legally obligated to pay damages to a third-party claimant after an adjudication or compromise, as the policy required. It claims that the trial court properly relied on *Zurich Insurance Co. v. Carus Corp.*, 293 Ill. App. 3d 906, 689 N.E.2d 130 (1997), and rejected CILCO's attempt to distinguish the instant case from *Carus* on duty to defend grounds. Home argues that *Carus* was not only based on the duty to defend, but also on the duty to indemnify. *Zurich Insurance Co. v. Carus Corp.*, 293 Ill. App. 3d 906, 689 N.E.2d 130 (1997). Further, Home contends that the trial court's decision is fully consistent with *Northern Illinois Gas Co. v. Home Insurance Co.*, 334 Ill. App. 3d 38, 777 N.E.2d 417 (2002), which rejected the same arguments that CILCO raises. Home also responds that CILCO's mitigation of damages argument is wrong as a matter of Illinois law.

CLMI responds to CILCO's coverage argument by contending that the trial court properly found that the investigation and remediation costs which CILCO incurred voluntarily are not covered under the CLMI policies. According to CLMI, under Illinois law, where the insured incurs investigation and remediation costs pursuant to a voluntary program, the insured has not been legally obligated to pay those expenses and is not entitled to coverage. To support this contention, CLMI cites to *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 607 N.E.2d 1204 (1992), *Lapham-Hickey Steel Corp. v. Protection Mutual Insurance Co.*, 166 Ill. 2d 520, 655 N.E.2d 842 (1995), *Zurich Insurance Co. v. Carus Corp.*, 293 Ill. App. 3d 906, 689 N.E.2d 130 (1997), and *Northern Illinois Gas Co. v. Home Insurance Co.*, 334 Ill. App. 3d 38, 777 N.E.2d 417 (2002). CLMI claims that *Carus* makes it clear that an insurer's duty to defend and indemnify is triggered by a suit against the insured, and in the absence of a suit, no duty exists. *Zurich Insurance Co. v. Carus Corp.*, 293 Ill. App. 3d at 910, 689 N.E.2d at 133. CLMI rejects CILCO's proposition that the duty to indemnify depends not on whether there has been a suit but, rather, on whether the insured faces legal liability.

■ In construing an insurance policy, the primary function of the court is to ascertain and enforce the intention of the parties as

_____

[3]Home notes that its response to the coverage issue is only directed to the Home III policy and the Persimmon site. As we have noted, Home was not sued with respect to the MacArthur site. Home also notes that Home II follows the form of the underlying CLMI policy effective between 1968 and 1971. Therefore, if the relevant policy language is different, Home adopts the arguments made by CLMI with respect to Home II.

expressed in the agreement. *Crum & Forster Management Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 391, 620 N.E.2d 1073 (1993). The court must construe the policy as a whole, taking into account the type of insurance for which the parties have contracted, the risks undertaken and purchased, the subject matter that is insured and the purposes of the entire contract. *Crum & Forster*, 156 Ill. 2d at 391, 620 N.E.2d at 1078.

■ On appeal from a summary judgment ruling, this court must conduct a *de novo* review. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 607 N.E.2d 1204 (1992). Summary judgment is only appropriate if the moving party demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Outboard Marine*, 154 Ill. 2d at 102, 607 N.E.2d at 1209.

## 1. *The Requirement of a "Suit"*

■ CILCO first contends that the trial court's ruling is contrary to the plain language of CILCO's indemnity-only policies, which do not require a "suit" but only a "legal obligation" to pay "damages" for property damage. Home responds that there has been no liability imposed on CILCO for damages to anyone through "adjudication or compromise" as defined in the "ultimate net loss" section in Home III. CLMI responds by insisting that some type of suit is necessary and cites to *Outboard Marine* to support this argument. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 607 N.E.2d 1204 (1992).

We agree with CILCO that the trial court erred in holding that a "suit" was required for indemnity to attach under these policies. The plain language of the insurance policies sold to CILCO does not require that a "suit" be brought in order for the indemnity obligation to arise. Under the plain language of Home III and the CLMI policies issued after 1979, coverage exists for liability "imposed *** by law" *or* "assumed" by the insured "under contract or agreement," for "damages" as a result of property damage. The plain language of the CLMI policies issued before 1979 provides coverage for liability imposed "by law" *or* by "final judgment" *or* by "agreement" for "damages" as a result of "property damage." The word "suit" does not appear anywhere in the "insuring agreements" of any of these policies.

Home notes that in Home III, "ultimate net loss" is defined as "the sum actually paid in cash in the settlement or satisfaction of losses for which the insured is liable either by adjudication or compromise with the written consent of the company." Home then contends that the "ultimate net loss" provision's reference to

"adjudication or compromise" narrows the scope of the "liability imposed *** by law" in the insuring agreement of the policy. We disagree. First, nowhere in Home III is a "compromise" defined as limited to judicial proceedings. Therefore, the word "compromise," standing alone, would also cover the compromise of statutory liability for property damage. Further, such a compromise could occur without the written consent of Home. An insurance company does not have unfettered discretion to withhold consent where, as in this case, it would have been futile. See, *e.g.*, *Davis v. United Fire & Casualty Co.*, 81 Ill. App. 3d 220, 225, 400 N.E.2d 984, 987 (1980) (futility excuses notification to insurer).

Second, even if we assume that Home is correct that this "ultimate net loss" definition limits the meaning of "liability *** imposed by law," and we do not, then it follows that the other policies in this case, which do not contain this language, provide for a broader type of "liability" beyond "adjudication" or "compromise." For example, the CLMI policies in effect from 1957 to 1979 define "ultimate net loss" as "the sums for which the Insured is liable in *settlement of an occurrence*" without any reference to an "adjudication," "judgment" or "suit." (Emphasis added.) Additionally, certain CLMI policies issued in the years 1963-71 stated that they "shall include" as "ultimate net loss" "all *expenses incurred in the investigations [and] adjustment *** therewith.*" (Emphasis added.) Inclusion of the word "expenses" in an excess/umbrella policy was found by the California Appellate Court in a recent decision to be a distinguishing factor from the California Supreme Court's holding in an earlier case. Further, it was the primary basis for the court's holding that the insurance company was obligated to pay the policyholder's "costs *** incur[red] in complying with the cleanup and abatement orders issued by the administrative agencies when no lawsuit was filed." *Powerine Oil Co. v. Superior Court*, 104 Cal. App. 4th 957, 977, 128 Cal. Rptr. 2d 827, 943 (2002) (*Powerine II*).[4]

Other policies likewise do not restrict "ultimate net loss" to judgments or settlements with the insurance companies' written consent. For example, a CLMI policy effective from April, 1, 1979, to April 1, 1981, provides that "[t]he term 'Ultimate Net Loss' shall mean the total sum which the Assured *** become[s] obligated to pay by reason of bodily injuries or property damage claims, either through *adjudica-*

---

[4]CILCO acknowledges and we agree that inclusion of the word "expenses" is not determinative of the "legal obligation" issue before this court. However, it is further evidence that the policies provide indemnity for "liability" beyond a "suit" or "judgment."

*tion or compromise,"* without requiring the insurance company's written consent. (Emphasis added.) Therefore, if the "ultimate net loss" language is reviewed, the use of the terms "settlement of an occurrence" and "adjudication or compromise" further demonstrates that the concept of "legal obligation" or "liability imposed by law" is broader than a "suit" or "judgment."

CLMI cites to *Outboard Marine* as support for its argument that some type of suit is necessary in order for CLMI to be required to indemnify CILCO for the environmental cleanup. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.,* 154 Ill. 2d 90, 607 N.E.2d 1204 (1992). In *Outboard Marine,* the defendants' comprehensive general liability insurers argued that they had no duty to defend lawsuits against the insured because those suits sought equitable relief compelling remedial activities, rather than compensatory damages. Our supreme court held:

> "To the popular mind, to most people, to ordinary laypersons, 'damages' connotes money one must expend to remedy an injury for which he or she is responsible, irrespective of whether that expenditure is compelled by a court of law in the form of compensatory damages or by a court of equity in the form of compliance with mandatory injunctions." *Outboard Marine,* 154 Ill. 2d at 116, 607 N.E.2d at 1216.

CLMI cites this quote from *Outboard Marine* and then argues that while enforcement may take the form of an action in law or an action in equity, some type of suit is necessary. We are not persuaded. First of all, this quote comes from the portion of the opinion where the supreme court is discussing the definition of the word "damages." Further, it is well settled that if the words in the policy are unambiguous, a court must afford them their plain, ordinary or popular meaning. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.,* 154 Ill. 2d 90, 108, 607 N.E.2d 1204, 1211 (1992). In *Outboard Marine,* the policy contained the word "suit." Again, the word "suit" is not found in any of the policies in this case. Therefore, a "suit" is not required before Home or CLMI has an obligation to indemnify CILCO for CILCO's environmental cleanup.

### 2. *"Legally Obligated"* to Pay

CILCO argues that it is "legally obligated" to remediate environmental contamination at its MGP sites under federal and state environmental laws and regulations. See 42 U.S.C. § 9601 *et seq.* (2000); 415 ILCS 5/22.2 (West 2002).

Home responds that the trial court properly relied on *Zurich Insurance Co. v. Carus Corp.,* 293 Ill. App. 3d 906, 689 N.E.2d 130 (1997), and properly rejected CILCO's attempt to distinguish the

instant case from *Carus* on duty to defend grounds. Home argues that *Carus* was not only based on the duty to defend, but also on the duty to indemnify. *Zurich Insurance Co. v. Carus Corp.*, 293 Ill. App. 3d 906, 689 N.E.2d 130 (1997). Further, Home contends that the trial court's decision is fully consistent with *Northern Illinois Gas Co. v. Home Insurance Co.*, 334 Ill. App. 3d 38, 777 N.E.2d 417 (2002), which rejected the same arguments that CILCO raises.

CLMI responds to CILCO's coverage argument by contending that the trial court properly found that the investigation and remediation costs which CILCO voluntarily incurred are not covered under the CLMI policies. According to CLMI, under Illinois law, where the insured incurs investigation and remediation costs pursuant to a voluntary program, the insured has not been legally obligated to pay those expenses and is not entitled to coverage. To support this contention, CLMI cites to *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 607 N.E.2d 1204 (1992), *Lapham-Hickey Steel Corp. v. Protection Mutual Insurance Co.*, 166 Ill. 2d 520, 655 N.E.2d 842 (1995), *Zurich Insurance Co. v. Carus Corp.*, 293 Ill. App. 3d 906, 689 N.E.2d 130 (1997), and *Northern Illinois Gas Co. v. Home Insurance Co.*, 334 Ill. App. 3d 38, 777 N.E.2d 417 (2002). CLMI claims that *Carus* makes it clear that an insurer's duty to defend and indemnify is triggered by a suit against the insured, and in the absence of a suit, no duty exists. *Zurich Insurance Co. v. Carus Corp.*, 293 Ill. App. 3d at 910, 689 N.E.2d at 133. CLMI rejects CILCO's proposition that the duty to indemnify depends not on whether there has been a suit but, rather, on whether the insured faces legal liability.

As we have noted, the trial court erred in ruling that the appropriate analysis was whether a "suit" has been filed against CILCO. Instead, we need to determine whether CILCO faces legal liability for environmental response costs.

■ We hold that the trial court erred when it found that CILCO was not "legally obligated" to remediate the environmental contamination at its MGP sites. First, CERCLA as well as the Illinois Environmental Protection Act mandates such cleanup. See 42 U.S.C. § 9601 *et seq.* (2000); 415 ILCS 5/22.2 (West 2002). Second, *Outboard Marine* and *Lapham-Hickey* do not stand for the rule that where the insured incurs investigation and remediation costs pursuant to a voluntary program, the insured is not legally obligated to pay those expenses and is not entitled to coverage. See *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 607 N.E.2d 1204 (1992); *Lapham-Hickey Steel Corp. v. Protection Mutual Insurance Co.*, 166 Ill. 2d 520, 655 N.E.2d 842 (1995). Third, we are not persuaded nor are we bound by the reasoning in *Carus* or *NiGas*. See *Zurich Insur-*

*ance Co. v. Carus Corp.*, 293 Ill. App. 3d 906, 689 N.E.2d 130 (1997); *Northern Illinois Gas Co. v. Home Insurance Co.*, 334 Ill. App. 3d 38, 777 N.E.2d 417 (2002). Finally, in holding that CILCO is "legally obligated" to clean up its MGP sites, we are persuaded by opinions filed in the United States District Court for the Northern District of Illinois, as well as courts of several other states. *Vogue Tyre & Rubber Co. v. CIGNA Property & Casualty Insurance Co.*, No. 96 C 4864 (N.D. Ill. November 13, 1998), *reconsideration granted & summary judgment denied*, No. 96 C 4864 (N.D. Ill. February 11, 1999); *Metex Corp. v. Federal Insurance Co.*, 290 N.J. Super. 95, 675 A.2d 220 (1996); *Weyerhaeuser Co. v. Aetna Casualty & Surety Co.*, 123 Wash. 2d 891, 874 P.2d 142 (1994); *Bausch & Lomb, Inc. v. Utica Mutual Insurance Co.*, 330 Md. 758, 625 A.2d 1021 (1993).

### a. CERCLA and the IEPA

The Comprehensive Response, Compensation, and Liability Act of 1980 (CERCLA or the Act) gives the federal government broad power to combat contamination of the environment. CERCLA imposes liability on parties designated as responsible for the release of hazardous substances into the air, land, surface water, or groundwater. 42 U.S.C. §§ 9601(8)(B), (14), (22), 9607(a), (b) (2000). Under the Act, the federal government may seek an injunction requiring the responsible party to clean up an environmentally contaminated site. See 42 U.S.C. § 9606(a) (2000). In the alternative, the government may: (1) clean up the site and demand reimbursement for its incurred costs (42 U.S.C. §§ 9604(a)(1), 9607(a) (2000)); or (2) issue an administrative order requiring the responsible party to perform the cleanup, subject to civil fines for a failure to comply (42 U.S.C. §§ 9606(a), (b) (2000)).

The IEPA imposes strict liability for the type of environmental contamination that was detected at the MGP sites. See 415 ILCS 5/22.2(f) (West 2000).

Here, it is undisputed that the MGPs are environmentally contaminated. Likewise, it is undisputed that CERCLA and the IEPA can make owners of contaminated property liable for the cleanup of contaminated MGP sites. Therefore, we do not agree with Home or CLMI that CILCO's cleanup of the sites was purely voluntary. Even if CILCO initially approached the IEPA about the cleanup and requested to be entered into the IEPA's Pre-Notice Program, it obviously did so to avoid the consequences of not "voluntarily" cleaning up the sites. The tacit threat of formal state or federal intervention was surely the impetus to begin the cleanup. When CILCO enrolled in the Pre-Notice Program, the work at the MGP sites became subject to specific IEPA guidelines and instructions on how to proceed. The IEPA regularly

reviewed, commented upon, and approved the work plans and reports prepared by CILCO. CILCO did not proceed with remediation until the IEPA had approved the documentation. Implicit in the IEPA's approval was the power to disapprove and demand that more be done. The IEPA did not adopt an adversarial posture toward CILCO. It did not sue the company. However, " 'polite but puissant compulsion' may inhere to State regulatory activities, especially when, as here, the regulators actively monitor the cleanup." *Bausch & Lomb Inc. v. Utica Mutual Insurance Co.*, 330 Md. 758, 780, 625 A.2d 1021, 1032 (1993), quoting *A.Y. McDonald Industries v. Insurance Co. of North America*, 475 N.W.2d 607, 620 (1991).

### b. *Outboard Marine* and *Lapham-Hickey*

In *Outboard Marine*, the defendant insurers argued that they had no duty to defend lawsuits against the insured because those suits sought equitable relief compelling remedial activities, rather than compensatory damages. Our supreme court held that damages connotes money paid to remedy an injury whether or not that expenditure is compelled by a court of law in the form of compensatory damages or by a court of equity in the form of compliance with mandatory injunctions. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 116, 607 N.E.2d 1204, 1216 (1992). *Outboard Marine* did not review the issue of whether an insurer was legally obligated to pay the costs of an environmental cleanup if the "damages" were not the result of some type of lawsuit. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 116, 607 N.E.2d 1204, 1216 (1992).

In *Lapham-Hickey*, our supreme court addressed the issue of whether a suit had been commenced against the insured sufficient to trigger the insurer's duty to defend. *Lapham-Hickey Steel Corp. v. Protection Mutual Insurance Co.*, 166 Ill. 2d 520, 526, 655 N.E.2d 842, 844 (1995). In addressing this issue, the court examined at length the meaning of the word "suit" in the primary comprehensive general liability policy's provision which provided for a duty to defend "suits." *Lapham-Hickey*, 166 Ill. 2d at 531, 655 N.E.2d at 847. The court held that the word "suit" in the context of a duty to defend was unambiguous and must be given its plain and ordinary meaning: a lawsuit. *Lapham-Hickey*, 166 Ill. 2d at 531-32, 655 N.E.2d at 847-48.

Although we are bound by the decisions of our supreme court, it is clear that the holdings in *Outboard Marine* and *Lapham-Hickey* do not impact the issue of whether CILCO was legally obligated to pay for the environmental cleanup of the MGP sites pursuant to the terms of its policies with Home and CLMI. See *Outboard Marine Corp. v.*

*Liberty Mutual Insurance Co.,* 154 Ill. 2d 90, 607 N.E.2d 1204 (1992); *Lapham-Hickey Steel Corp. v. Protection Mutual Insurance Co.,* 166 Ill. 2d 520, 655 N.E.2d 842 (1995). Therefore, we will look to appellate court decisions that have addressed this issue.

### c. *Carus* and *NiGas*

In 1997, the First District rendered its decision in *Zurich Insurance Co. v. Carus Corp.,* 293 Ill. App. 3d 906, 689 N.E.2d 130 (1997). In *Carus,* the plaintiff-insurer brought a declaratory judgment action against the defendant-insured, Carus Corporation, a chemical manufacturer. The plaintiff sought a declaration as to whether it owed Carus reimbursement for expenses incurred during an investigation of possible contamination in the soil and groundwater. The general liability policies at issue in *Carus* are similar to the policies in this case.

In 1991, the IEPA and the United States Environmental Protection Agency made an assessment of the Carus chemical facility. In 1993, Carus petitioned the IEPA to proceed under the site remediation program. In 1994, the IEPA notified Carus that hazardous substances had been found on the property. In 1995, the plaintiff filed its declaratory judgment action. All parties filed motions for summary judgment, and the trial court granted the insurers' motions and denied Carus's motion. The issue on appeal was whether the insurers were "required to indemnify Carus for expenses incurred while participating in the IEPA's site remediation program." *Carus,* 293 Ill. App. 3d at 908, 689 N.E.2d at 132. The *Carus* court held that the insurers had no duty to defend or indemnify Carus because the language in the policies required the environmental agencies to initiate a proceeding in a court of law in order for coverage to apply. *Carus,* 293 Ill. App. 3d at 910, 689 N.E.2d at 133. To support this conclusion, *Carus* cited to two Illinois Supreme Court decisions when it stated, "The rule coming out of *Outboard Marine* and *Lapham-Hickey* is clear: an insurer's duty to defend and indemnify is triggered by a suit against the insured, and in the absence of a lawsuit, no such duty exists. Since no suit was brought against Carus, the insurers had no duty to defend or indemnify." *Carus,* 293 Ill. App. 3d at 910, 689 N.E.2d at 134, citing *Outboard Marine Corp. v. Liberty Mutual Insurance Co.,* 154 Ill. 2d 90, 607 N.E.2d 1204, and *Lapham-Hickey Steel Corp. v. Protection Mutual Insurance Co.,* 166 Ill. 2d 520, 655 N.E.2d 842 (1995).

Five years later, the First District decided *Northern Illinois Gas Co. v. Home Insurance Co.,* 334 Ill. App. 3d 38, 777 N.E.2d 417 (2002) (*NiGas*). In *NiGas,* the gas company bought comprehensive general liability policies from insurance companies. The policy language in *NiGas* is also similar to that of the policies in the instant case.

While the policies were in effect, the gas company voluntarily investigated and cleaned up several of its MGP sites that had become contaminated. It then sought a determination that the insurers were required to indemnify NiGas for the cleanup. An IEPA official testified that although the IEPA informed utility companies that they might want to investigate potential environmental problems at the MGP sites, the official stressed that the utilities were not legally obligated to enroll in any program. The court in *NiGas* relied heavily on the IEPA official's testimony regarding the voluntary nature of the cleanup and held that enrollment of MGP sites in the IEPA's voluntary cleanup programs was not a liability imposed on the policyholder by law, as required by third-party indemnity policies that have no duty to defend. *Northern Illinois Gas Co. v. Home Insurance Co.*, 334 Ill. App. 3d 38, 55, 777 N.E.2d 417, 430 (2002).

It is well-settled law that one district of an appellate court is not bound by the decisions of another district of that court. See *State Farm Fire & Casualty Co. v. Yapejian*, 152 Ill. 2d 533, 539, 605 N.E.2d 539, 542 (1992). We have reviewed *Carus* and *NiGas* and believe that they are wrongly decided. Contrary to the holding in *Carus*, and as we have noted, we do not agree that *Outboard Marine* and *Lapham-Hickey* established as a rule that an insurer's duty to defend and indemnify is triggered by a suit against the insured, and in the absence of a lawsuit, no such duty exists. See *Zurich Insurance Co. v. Carus Corp.*, 293 Ill. App. 3d 906, 689 N.E.2d 130 (1997); *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 607 N.E.2d 1204 (1992); *Lapham-Hickey Steel Corp. v. Protection Mutual Insurance Co.*, 166 Ill. 2d 520, 655 N.E.2d 842 (1995). Further, we disagree with the ruling in *NiGas* that a "voluntary" cleanup program is not a liability imposed on the policyholder by law when state and federal law both mandate such cleanup. See *Northern Illinois Gas Co. v. Home Insurance Co.*, 334 Ill. App. 3d 38, 777 N.E.2d 417 (2002). We decline to follow those cases.

d. *Vogue Tyre* and Other State Cases

In *Vogue Tyre & Rubber Co. v. CIGNA Property & Casualty Insurance Co.*, No. 96 C 4864 (N.D. Ill. November 13, 1998), *reconsideration granted & summary judgment denied*, No. 96 C 4864 (N.D. Ill. February 11, 1999), the insured sought, *inter alia*, to be indemnified for expenses incurred in remediating environmental contamination resulting from leaking underground storage tanks. The insurance company denied that it had a duty to defend or indemnify Vogue Tyre because no suit had been filed, and it moved for summary judgment. In reviewing whether there was a duty to indemnify under the policies, the court held that the proper inquiry is whether the policyholder faces legal liability, not whether there is a "lawsuit":

"The language of the policies clearly states that CIGNA will indemnify Vogue Tyre for all sums it becomes legally obligated to pay as damages because of bodily injury or property damage. Its plain language does not require a lawsuit to begin that obligation. Therefore, the issue is not whether a suit has been initiated against Vogue Tyre, but rather whether Vogue Tyre was legally obligated to clean up the environmental contamination under the Environmental Protection Act ('the Act')." *Vogue Tyre*, slip op. at ___.

Upon reconsideration, the *Vogue Tyre* court denied the insurance company's motion for summary judgment, finding that Illinois law does not require a court action to trigger a legal obligation. Instead, it held that a duty to indemnify existed because environmental regulations mandated the cleanup. *Vogue Tyre*, slip op at ___. Moreover, the *Vogue Tyre* court rejected the insurers' argument that *Outboard Marine* held that a third-party action is required to create "damages" in a comprehensive general liability policy under Illinois law. *Vogue Tyre* correctly noted that *Outboard Marine* construed the word "damages" as used in the policy broadly, not narrowly, and held that "damages" " 'connotes money one must expend to remedy an injury for which he or she is responsible.' " *Vogue Tyre*, slip op. at ___, quoting *Outboard Marine*, 154 Ill. 2d at 116, 607 N.E.2d at 1216. Finally, *Vogue Tyre* noted that *Outboard Marine* did not address whether a legal imposition required third-party action or could be triggered by complying with mandatory environmental regulations. See *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 607 N.E.2d 1204 (1992).

We are persuaded by the reasoning of the court in *Vogue Tyre*. In the instant case, CILCO is legally obligated under federal and state laws to comply with mandatory environmental regulations. The fact that it chose to voluntarily remediate its MGP sites before the federal or state government took action is irrelevant to this analysis. The focus of our consideration is whether CILCO was "legally obligated" to clean up the sites. It was. See 42 U.S.C. § 9601 *et seq.* (2000); 415 ILCS 5/22.2 (West 2002). Therefore, because CILCO is liable for the costs of investigation, prevention, mitigation and/or remediation damage to groundwater, surface water or other natural resources of the State of Illinois at or around the MGP sites, we find that it is "legally obligated" to remediate the environmental contamination at the sites as provided in the policies.

Cases in several other states that have addressed the issue of indemnity for environmental cleanup have agreed with this analysis. See *Bausch & Lomb, Inc. v. Utica Mutual Insurance Co.*, 330 Md. 758, 779-80, 625 A.2d 1021, 1031-32 (1993) (Maryland Court of Appeals

held that although the state filed no suit or issued any order, the tacit threat of state intervention through Maryland environmental regulations satisfied the requirement that the contaminator was legally obligated to pay); *Weyerhaeuser Co. v. Aetna Casualty & Surety Co.*, 123 Wash. 2d 891, 896, 874 P.2d 142, 145 (1994) (Supreme Court of Washington held that an insurer may be legally obligated to pay for property damage by reason of state environmental statutes when an insured engages in the voluntary cleanup of contamination in cooperation with an environmental agency); *Metex Corp. v. Federal Insurance Co.*, 290 N.J. Super. 95, 104, 675 A.2d 220, 225 (1996) (Superior Court of New Jersey held that it is the statutory mandate that makes a polluter legally obligated to pay damages because of property damage, not whether a lawsuit had been filed or an agency had issued a directive to remediate the contamination).

### 3. "As Damages"

■ Both defendants claim that the term "as damages" as referenced in their respective policies means that they do not have to pay the cost of the MGP cleanups unless CILCO has paid cash because a claim or lawsuit was adjudicated against it. Additionally, Home argues that the defined term "ultimate net loss" in Home III expressly states that Home's only obligation is to indemnify CILCO for those sums CILCO "paid in cash in settlement or in satisfaction of losses for which [CILCO] is liable either by adjudication or compromise with the written consent of [Home]."

We are not persuaded. First, as was noted in *Vogue Tyre*, the Illinois Supreme Court in *Outboard Marine* held that the word damages " 'connotes money one must expend to remedy an injury for which he or she is responsible.' " *Vogue Tyre*, slip op. at ___, quoting *Outboard Marine*, 154 Ill. 2d at 116, 607 N.E.2d at 1216. Therefore, no claim or suit is needed to constitute damages. Second, as we have previously stated, Home III cannot be read as restrictively as Home desires. The word "compromise" in Home III's "ultimate net loss" provision is, under its plain and ordinary meaning, not limited to compromise of judicial proceedings. It would also cover the compromise of a statutory liability for property damage. An insurance company does not have unfettered discretion to withhold its consent where, as in this case, it would have been futile. See, *e.g.*, *Davis v. United Fire & Casualty Co.*, 81 Ill. App. 3d 220, 225, 400 N.E.2d 984, 987 (1980) (futility excuses notification to insurer).

In sum, the trial court erred in granting summary judgment in favor of the defendants on the issue of coverage. Both Home and CLMI were obligated to indemnify CILCO for the costs incurred in the

cleanup and remediation of the MGPs based on the wording of their respective policies. Accordingly, we reverse the trial court's grant of summary judgment on this issue.

## B. The Missing Policies

Next, CILCO argues that the trial court erred in dismissing the missing policies because CILCO presented sufficient evidence of the policies' existence and essential terms to create a genuine issue of material fact. Within this argument, CILCO also claims that the trial court erred in denying its motion to compel additional discovery. In response, CLMI contends that the trial court properly granted its motion for summary judgment dismissing these policies because CILCO: (1) did not establish a foundation for the use of secondary evidence; and (2) did not establish the essential terms of the purported policies. CLMI also claims that the trial court properly denied CILCO's request for additional discovery because CILCO was not entitled to belatedly requested additional discovery.

### 1. *Summary Judgment Motion Dismissing the Missing Policies*

■ In order to introduce secondary evidence of a writing, a party must first prove: (1) prior existence of the original; (2) that the document is lost, missing, destroyed or unavailable; (3) the substitute is authentic; and (4) the party has been unable to locate the policies through a diligent search. *Gillson v. Gulf, Mobile & Ohio R.R. Co.*, 42 Ill. 2d 193, 246 N.E.2d 269 (1969). The party seeking to prove the existence and terms of the missing policies must do so by a preponderance of the evidence. See *Sears, Roebuck & Co. v. Seneca Insurance Co.*, 254 Ill. App. 3d 686, 691, 627 N.E.2d 173, 177 (1993). Summary judgment is only appropriate if the moving party demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 607 N.E.2d 1204 (1992).

■ We have reviewed the parties' briefs as well as the record and conclude that CILCO established a foundation for the use of the secondary evidence and the terms of the purported policies that is sufficient to withstand a motion for summary judgment. From 1988 to 1991, CILCO conducted an extensive search of its own insurance department files, the company's record center, and the files of the insurance broker involved in the placement of the policies. CILCO also retained an insurance archaeology firm to assist it in locating copies of the missing policies. The evidence uncovered from this search confirms the existence of the policies. CILCO's secondary evidence includes "placing slips" signed or stamped by the lead London underwriter indicating his acceptance of the risk. These efforts are clearly suf-

ficient to establish that a diligent search was conducted by CILCO. If there is any doubt as to the movant's right to summary judgment, that doubt must be resolved in favor of the nonmovant so that evidence may be presented to the trier of fact. See *Reed v. Fleming*, 132 Ill. App. 3d 722, 477 N.E.2d 733 (1985). For these reasons, we find that the trial court erred in granting CLMI's motion for summary judgment on the missing policies issue.

### 2. *CILCO'S Motion for Additional Discovery*

■ CILCO argues that the trial court erred in denying its motion for additional discovery. Generally, CILCO sought discovery of standard or sample policy language in use by the defendants at the time of the "missing" policies. In response, CLMI contends that CILCO had ample opportunity to conduct discovery and was not entitled to belatedly requested additional discovery.

The trial court's decision to admit evidence should not be reversed unless it is an abuse of discretion. *Copeland v. Stebco Products Corp.*, 316 Ill. App. 3d 932, 738 N.E.2d 199 (2000). The primary goal of the discovery rules is to promote complete disclosure. *Buehler v. Whalen*, 70 Ill. 2d 51, 374 N.E.2d 460 (1977).

Here, the trial court abused its discretion in denying CILCO's motion for additional discovery. The discovery that CILCO requested, sample policy language used by the defendants at the time of the "missing" policies, is highly relevant to this case. That discovery may aid CILCO in establishing the essential terms of its missing policies. Therefore, the trial court erred in denying this motion.

### C. Legal Expenses for the Vector-Springfield Litigation

Finally, CILCO is appealing the trial court's order granting Home's motion for partial summary judgment that Home had no duty to pay legal expenses for what is referred to as the Vector-Springfield litigation. At issue in this motion is $350,000 in legal fees CILCO spent successfully defending a lawsuit brought by the owner of property adjacent to the First and Washington MGP site. In granting Home's motion, the trial court found that the definition of "ultimate net loss" in Home III excluded legal expenses. The court further noted that although the policy provides for reimbursement for legal expenses in certain situations, none of those situations were applicable to this case, where CILCO successfully defended the action brought against it and paid nothing in settlement or satisfaction of any loss.

CILCO claims that although legal expenses should be incurred with the "consent of the company," as required under the policy, Home was specifically advised about the lawsuit and the defense in May 1985 and raised no objection. According to CILCO, Home's silence

constitutes consent to the defense expenditures that continued through 1997. In the alternative, CILCO claims that Home's inaction demonstrates that it would have been futile for CILCO to seek Home's consent to those legal expenses because Home intended to deny coverage all along, as evidenced by the fact that it conducted no investigation and took no coverage position. CILCO also claims that the last sentence of the "ultimate net loss" definition provides for an independent basis requiring Home to reimburse CILCO for its legal expenses as "ultimate net loss." Finally, CILCO contends that the trial court's interpretation of the policy as requiring a settlement or judgment in order to be indemnified for legal expenses would lead to the absurd result that CILCO must lose a lawsuit brought by a third party before it could be indemnified for legal expenses.

■ Again, in construing the language of an insurance policy, the court's primary objective is to ascertain and give effect to the intent of the parties of the contract. *Travelers Insurance Co. v. Eljer Manufacturing, Inc.*, 197 Ill. 2d 278, 757 N.E.2d 481 (2001). "If the words of a policy are clear and unambiguous, 'a court must give them their plain, ordinary and popular meaning.' " (Emphasis omitted.) *Travelers Insurance Co.*, 197 Ill. 2d at 292-93, 757 N.E.2d at 491, quoting *Outboard Marine*, 154 Ill. 2d at 108. Therefore, an insurer's duty to defend, and likewise to pay legal expense, arises only from an express undertaking as stated in the policy. See *Zurich Insurance Co. v. Raymark Industries*, 118 Ill. 2d 23, 514 N.E.2d 150 (1987).

■ It is undisputed that the Home III policy does not contain a duty to defend. Therefore, we are only concerned with whether Home must contribute to the cost of legal expenses that CILCO incurred in defending the Vector-Springfield litigation. The policy is quite clear on this point. Home's only indemnity duty to CILCO is for "ultimate net loss" that exceeds $100,000. CILCO's $350,000 in legal expenses is not considered part of the "ultimate net loss" because legal expenses are expressly excluded. Therefore, CILCO's legal expenses are not applied to the requirement that the "ultimate net loss" exceed CILCO's self-insured retention of $100,000.

We disagree with CILCO that the last sentence of the "ultimate net loss" definition provides for an independent basis requiring Home to reimburse CILCO's legal expenses as "ultimate net loss." The last statement states, "[e]xcept for Condition G, legal expenses must be incurred with Home's consent and apportioned in proportion to the respective interests as finally determined." The plain meaning of that sentence is that legal expenses are covered under certain other policy conditions. If one of those conditions applies, that sentence requires Home's consent, except for condition G, and sets forth that the legal

expenses shall be apportioned in proportion to the respective interests as finally determined. None of the other conditions in the policy applied, so CILCO's argument about Home's lack of consent is irrelevant.

The first requirement under condition G is that there be an occurrence that involves liability on the part of Home. If there was a covered occurrence, condition G only applies if Home had a share of the loss. Here, Home did not have a share of the loss because CILCO prevailed in the Vector-Springfield litigation. Therefore, there was no "sum actually paid in cash in the settlement or satisfaction of losses for which the insured is liable, either by adjudication or compromise with the written consent of [Home]." Because Home is not liable for "ultimate net loss" in excess of $100,000, it is not required to reimburse CILCO for its legal expenses under condition G.

Condition G's requirement that there be liability on the part of Home before it agrees to pay legal expenses reflects the excess nature of the policy. It is well settled that primary and excess insurers insure different risks. Instead of providing a duty to defend, most excess policies require the excess insurer to indemnify for the costs of the defense as part of the "ultimate net loss" against which the policy insures. See *Krusinski Construction Co. v. Northbrook Property & Casualty Insurance Co.*, 326 Ill. App. 3d 210, 219, 760 N.E.2d 530, 537-38 (2001). By the very nature of the coverage purchased, Home has no duty to indemnify CILCO unless CILCO is liable for damages in the underlying action in excess of $100,000.

We are not persuaded by CILCO's argument that the policy as written would lead to absurd results. If CILCO wanted its defense costs paid, it should have purchased primary insurance or found an excess carrier willing to pay legal expenses as an obligation of the policy. For these reasons, we hold that the trial court properly granted Home's motion for partial summary judgment that it was not responsible to pay the legal expenses associated with the Vector-Springfield litigation.

### D. The Defendants' Remaining Summary Judgment Motions

■ Finally, the defendants have appealed the trial court's denial of three summary judgment motions. Home has appealed the denial of its "trigger" of coverage motion as well as its "late notice" motion. CLMI has appealed the trial court's denial of its "trigger" of coverage motion.

The denial of a motion for summary judgment is not a final and appealable order. *Blott v. Hanson*, 283 Ill. App. 3d 656, 670 N.E.2d 345 (1996). Here, the denial of Home's and CLMI's motions for summary judgment are not final orders. Therefore, they are not appealable as a matter of law.

## III. CONCLUSION

We reverse the trial court's ruling granting summary judgment in favor of the defendants on the issue of indemnity. We also reverse the trial court's order granting summary judgment in favor of the defendants on the missing policies issues. We affirm the trial court's ruling that CILCO was not entitled to legal expenses for the costs incurred in defending the Vector-Springfield litigation. Finally, we decline to review the defendants' appeals from the denial of their summary judgment motions.

Accordingly, the judgment of the circuit court of Peoria County is affirmed in part and reversed in part.

Affirmed in part; reversed in part.

HOLDRIDGE and LYTTON, JJ., concur.